OPINION
GREENAWAY, JR., Circuit Judge.
This appeal stems from the Government’s warrantless installation of a Global Positioning System device (a “GPS device” or “GPS tracker”) to track the movements of Appellee Harry Katzin’s van. Harry Katzin, along with his brothers Mark and Michael (collectively, “Appellees”), claims that attaching the GPS device without a warrant violated the Fourth Amendment. The United States Government (“Appellant” or “Government”) argues that: (a) a warrant is not required to install a GPS device; (b) even if a warrant were required, the police were acting in good faith; and (c) in any case, Mark and Michael lack standing to contest admissibility of evidence recovered from Harry Katzin’s van.
The instant case therefore calls upon us to decide two novel issues of Fourth Amendment law: First, we are asked to decide whether the police are required to obtain a warrant prior to attaching a GPS device to an individual’s vehicle for purposes of monitoring the vehicle’s movements (conduct a “GPS search”). If so, we are then asked to consider whether the unconstitutionality of a warrantless GPS search may be excused for purposes of the exclusionary rule, where the police acted before the Supreme Court of the United States proclaimed that attaching a GPS device to a vehicle constituted a “search” under the Fourth Amendment. For the reasons discussed below, we hold that the police must obtain a warrant prior to a GPS search and that the conduct in this case cannot be excused on the basis of good faith. Furthermore, we hold that all three brothers had standing to suppress the evidence recovered from Harry Katzin’s van. We therefore will affirm the District Court’s decision to suppress all fruits of the unconstitutional GPS search.
I. FACTS AND PROCEDURAL HISTORY
Given that the issues in this matter touch upon several forms of electronic tracking devices, we feel it necessary — in service of our forthcoming analysis — to embark on a brief discussion of the relevant technology before delving into the specific circumstances surrounding Appellees.
A. Tracking Technology
This case concerns a “slap-on” GPS tracker, so called because it magnetically attaches to the exterior of a target vehicle, is battery operated, and thereby requires no electronic connection to the automobile. The tracker uses the Global Positioning System — a network of satellites originally developed by the military — to determine its own location with a high degree of specificity and then sends this data to a central server. This check-and-report process repeats every few minutes (depending on the tracker), thereby generating a highly accurate record of the tracker’s whereabouts throughout its period of operation. The great benefit of such a system — apart from its accuracy — is that anyone with access to the central server can analyze or monitor the location data remotely. These aspects make GPS trackers particularly appealing in law enforcement contexts, where the police can attach a tracker to some vehicle or other asset and then remotely monitor its location and movement.
GPS technology must be distinguished from the more primitive tracking devices of yesteryear such as “beepers.” Beepers are nothing more than “radio transmitted[s], usually battery operated, which *192 emit[ ] periodic signals that can be picked up by a radio receiver.” United States v. Knotts, 460 U.S. 276, 277, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). In contrast to GPS trackers, beepers do not independently ascertain their location — they only broadcast a signal that the police can then follow via a corresponding receiver. Moreover, beeper signals are range-limited: if the police move far enough away from the beeper, they will be unable to receive the signal that the unit broadcasts. At bottom, then, beepers are mere aids for police officers already performing surveillance of a target vehicle. Unlike GPS trackers, beepers require that the police expend resources — time and manpower — to physically follow a target vehicle.
B. The Brothers Katzin
A spectre was haunting Delaware, Maryland, and New Jersey in 2009 and 2010 — the three states had been hit by a wave of pharmacy burglaries, many of which affected Rite Aid pharmacies. The method used in the various crimes was largely consistent: in many cases, the alarm systems for the pharmacies would be disabled by cutting the external phone lines. The local police approached the FBI for help (collectively, “the police”) and the hunt was on.
By mid-May 2010, a suspect emerged: a local electrician named Harry Katzin. Not only had he recently been caught burglarizing a Rite Aid pharmacy, but he and his brothers — Mark and Michael — had criminal histories that included arrests for burglary and theft. Over the course of the following months, the joint state and federal investigation began receiving reports of seeing Harry Katzin around Rite Aid pharmacies throughout the three states. For example, in late October 2010, local police in Pennsylvania encountered Harry Katzin crouching beside some bushes outside of a Rite Aid after responding to reports of suspicious activity. The police did not arrest him, but discovered the next day that the phone lines to the pharmacy had been cut. The next month, Harry Katzin, along with one of his brothers and one other individual, was approached by the police as he sat outside of a different Rite Aid in his Dodge Caravan. After Harry Katzin consented to a search, the police discovered electrical tools, gloves, and ski masks. Harry Katzin explained that these were tools of the electrician’s trade and the police allowed the men to leave. The telephone lines to this Rite Aid had also been cut. Soon thereafter, the police obtained footage of another recently burglarized Rite Aid showing that a vehicle similar to Harry Katzin’s van had been parked outside for a long period of time. As the pieces began falling into place, the police proceeded with their next step: electronic tracking. The police knew that Harry Katzin regularly parked his van on a particular street in Philadelphia. Thus, in the early hours of a mid-December morning, after consulting with the United States Attorney’s office, but without obtaining a warrant, the FBI affixed a “slap-on” GPS tracker to the exterior of Harry Katzin’s van.
While the police do not appear to have set a time limit for using the GPS tracker, the device yielded the results they were after within several days. According to the tracker, Harry Katzin’s van had left Philadelphia on the evening of December 15, 2010, and had traveled to the immediate vicinity of a Rite Aid in a neighboring town. Through use of the device, the police could see that the van had been driven around the town for several minutes before parking at a specific location for over two hours. That’s when the FBI began to tighten the net. They alerted local police as to Harry Katzin’s whereabouts, but cautioned them not to approach too closely for fear of tipping off either Harry Katzin or any individual he may have been traveling with. When the FBI noticed that the van *193 was once again on the move, the call came in: the van was to be taken.
While state troopers stopped Harry Katzin’s van on a Pennsylvania highway, a squad of local police officers investigated the Rite Aid closest to where Harry Katzin’s van had been parked; they found that it had been burglarized and relayed this information to the troopers. Inside the van, troopers found Harry at the wheel, with Mark and Michael as passengers. From outside of the van, the troopers could see merchandise and equipment from the burglarized Rite Aid, including pill bottles and Rite Aid storage bins. The police impounded the van and arrested the Katzin brothers.
All three brothers moved to suppress the evidence discovered in the van. The Government opposed the motions, arguing: (a) that a warrant was not required for use of the GPS device; (b) that the police had acted in good faith when installing the GPS device; and (c) that Mark and Michael lacked standing to challenge the GPS search and therefore could not move to suppress any of the evidence. The District Court held in favor of the brothers and suppressed all of the evidence found in the van. United States v. Katzin, No. 11-226, 2012 WL 1646894, *11 (E.D.Pa. May 9, 2012). This appeal followed.
II. JURISDICTION AND STANDARD OF REVIEW
The District Court had jurisdiction to hear this case pursuant to 18 U.S.C. § 3231; our jurisdiction stems from 18 U.S.C. § 3731. In reviewing a district court’s ruling on a motion to suppress, “we review [the] court’s factual findings for clear error, and we exercise de novo review over its application of the law to those factual findings.” United States v. Pavulak, 700 F.3d 651, 660 (3d Cir.2012) (citing United States v. Coles, 437 F.3d 361, 365 (3d Cir.2006)).
III. GPS SEARCHES AND THE WARRANT REQUIREMENT
The Fourth Amendment mandates that [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV. Prior to 1967, the Supreme Court of the United States interpreted this language generally to mean that the Fourth Amendment prevented the police from physically intruding upon an individual’s private property for purposes of conducting a search (the physical intrusion theory). See United States v. Jones, — U.S. —, 132 S.Ct. 945, 949-50, 181 L.Ed.2d 911 (2012); see also, e.g., Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (upholding the warrantless wiretapping of a target’s telephone lines primarily because “[t]here was no entry of the houses or offices of the defendants”), overruled in part by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[1] A change came in *194 1967 with the decision in Katz v. United States, which involved the warrantless wiretapping of a public phone booth. 389 U.S. 347, 88 S.Ct. 507. In Katz, the Court announced that the Fourth Amendment “protects people, not places,” id. at 351, 88 S.Ct. 507, a principle that eventually became embodied in what Justice Harlan termed an individual’s “reasonable expectation of privacy” (the privacy theory), id. at 360-61, 88 S.Ct. 507 (Harlan, J., concurring). In subsequent years, the privacy theory became the driving force behind Fourth Amendment jurisprudence, while the physical intrusion theory lay dormant. See, e.g., United States v. Santillo, 507 F.2d 629, 632 (3d Cir.1975) (noting that “the trespassory concepts [in early Fourth Amendment jurisprudence] ... have since been discredited” (footnotes omitted) (citing Katz, 389 U.S. at 352-53, 88 S.Ct. 507)).
A. Beepers, GPS Devices, and the Fourth Amendment
It was in this context that courts began grappling with the constitutionality of using tracking devices. For purposes of our discussion, we begin with the Fifth Circuit’s 1981 decision in United States v. Michael, 645 F.2d 252 (5th Cir.1981) (en banc), which considered the warrantless use of a beeper for surveillance of a suspected drug manufacturer. In Michael, the court assumed that installation of the beeper on the exterior of a van constituted a search before holding that the DEA agents’ conduct was constitutional since they acted based on reasonable suspicion. Id. at 256-59 (holding that defendant had “reduced” privacy expectations in the movement of his automobile and that the use of a beeper was minimally intrusive). A pair of dissenting opinions argued that, among other things, the DEA agents were required to obtain a warrant because they physically intruded upon the defendant’s property (i.e., his car). See, e.g., id. at 260-70 (Tate, J., dissenting).
Two years later, the Supreme Court took up the beeper issue, ultimately holding that concealing a beeper inside of a container that was then loaded onto a target’s vehicle did not constitute a search, where the beeper’s placement was accomplished with the container owner’s consent. United States v. Knotts, 460 U.S. 276, 279-80, 285, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). In so doing, the Supreme Court explained that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Id. at 281, 103 S.Ct. 1081. Nonetheless, the Court’s ruling was not unequivocal, with the Majority cautioning that twenty-four hour, “dragnet type law enforcement practices” could implicate “different constitutional principles.” Id. at 283-84, 103 S.Ct. 1081.
The Supreme Court returned to beepers the following year when it decided United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), which centered on the DEA’s use of a beeper to collect information regarding the whereabouts of objects inside a private residence. In Karo, the DEA had once again secreted a beeper inside of a container— also with the container owner’s consent— and ensured that the container would be loaded into the target’s vehicle. Id. at 708-09, 104 S.Ct. 3296. The agents then used the beeper to track the vehicle to various locations and determined that the beeper-concealing container had been brought inside several residences (something that they could not verify with visual surveillance). Id. at 709-10, 104 S.Ct. 3296. In holding that use of the beeper *195 was unconstitutional under those circumstances, the Court explained that, unlike in Knotts — where information was “voluntarily conveyed to anyone who wanted to look” — the information obtained by monitoring the beeper while inside a private residence gave the DEA information “that could not have been visually verified.” Id. at 715, 104 S.Ct. 3296 (internal quotation marks omitted). In a partial dissent, Justice Stevens (joined by Justices Brennan and Marshall) argued that placing the beeper inside a container, which was then loaded into the target’s vehicle, implicated both a “seizure and a search within the meaning of the Fourth Amendment.” Id. at 728, 104 S.Ct. 3296 (Stevens, J., dissenting in part).
After the beeper-centered decisions in Michael, Knotts, and Karo, technological advances heralded the advent of a new electronic surveillance device: the GPS tracker. One of the first decisions to address the constitutionality of this new technology was United States v. McIver, 186 F.3d 1119 (9th Cir.1999). In Mclver, the Ninth Circuit rejected defendant’s argument that installing a GPS device (along with a beeper) on the “undercarriage of [the defendant’s automobile]” constituted a “seizure of the vehicle.” Id. at 1127 (“Mclver did not present any evidence that the placement of the magnetized tracking devices deprived him of dominion and control of his [vehicle], nor did he demonstrate that the presence of these objects caused any damage to the electronic components of the vehicle.”). The court also concluded that, because Mclver could demonstrate no reasonable expectation of privacy in the exposed undercarriage of his car, the use of the electronic devices did not constitute a search under the Fourth Amendment. Id. at 1126-27.
The Seventh Circuit followed suit in 2007, with Judge Posner explaining that attaching a GPS device to a target vehicle did not constitute a search because such a device merely substitutes for “following a car on a public street,” an activity that “is unequivocally not a search within the meaning of the [Fourth Amendment].” United States v. Garcia, 474 F.3d 994, 997 (7th Cir.2007). However, echoing the Supreme Court’s concerns in Knotts, the Seventh Circuit warned that it might need to reevaluate its conclusion if faced with a case concerning use of GPS technology for mass surveillance. Id. at 998.
Three years later, the Ninth Circuit returned to the topic of GPS tracking, reaffirming its conclusion that attaching a GPS tracker to the undercarriage of a vehicle did not constitute a search. United States v. Pineda-Moreno, 591 F.3d 1212, 1214-15 (9th Cir.2010). The appellant filed a petition for rehearing en banc, and though the Ninth Circuit denied the petition, Chief Judge Kozinski issued a fiery dissent from the denial, accusing the Pineda-Moreno majority of being “inclined to refuse nothing” to the needs of law enforcement. United States v. Pineda-Moreno, 617 F.3d 1120, 1121 (9th Cir.2010) (Kozinski, C.J., dissenting). In his dissent, the Chief Judge noted that GPS devices “have little in common with the primitive devices in Knotts,” in part because, unlike GPS devices, beepers “still require! ] at least one officer — and usually many more — to follow the suspect.” Id. at 1124. Thus, the dissent noted, while “[y]ou can preserve your anonymity from prying eyes, even in public, by traveling at night, through heavy traffic, in crowds, by using a circuitous route, disguising your appearance, passing in and out of buildings and being careful not to be followed,” there is “no hiding from the all-seeing, network of GPS satellites that hover overhead, which never sleep, never blink, and never lose attention.” Id. at 1126.
*196 That same year, the Eighth Circuit became the third of our sister courts to say that attaching a GPS device to a target car was not a constitutional violation. United States v. Marquez, 605 F.3d 604, 609-10 (8th Cir.2010). While the Marquez court based its ruling on standing grounds, it still announced — albeit in dicta — that “[w]hen electronic monitoring does not invade upon a legitimate expectation of privacy, no search has occurred.” Id. at 609 (“A person traveling via automobile on public streets has no reasonable expectation of privacy in his movements from one locale to another.” (citing Knotts, 460 U.S. at 281, 103 S.Ct. 1081)).
Later that year, the D.C. Circuit split from our sisters, holding that attaching a GPS device to a defendant’s vehicle constituted a search under the Fourth Amendment that required the police to obtain a warrant. United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010). In so doing, the court rejected the Knotts-based argument that a driver’s movements are exposed to the public and therefore do not constitute information shielded by the Fourth Amendment. Id. at 560 (“[W]e hold the whole of a person’s movements over the course of a month is not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil.”). At the same time, the court in Maynard rejected the applicability of the automobile exception to the warrant requirement, holding that while the exception “permits the police to search a car without a warrant if they have reason to believe it contains contrabando it] ... does not authorize them to install a tracking device on a car without the approval of a neutral magistrate.” Id. at 567. A year later, the Supreme Court granted certiorari, changing the name to United States v. Jones, — U.S.-, 131 S.Ct. 3064, 180 L.Ed.2d 885 (2011).
In reviewing the Maynard decision (now called Jones), the Supreme Court held that magnetically attaching a GPS device to a suspect’s automobile constituted a search for purposes of the Fourth Amendment. Jones, 132 S.Ct. at 949. Rather than focusing on whether the owner of the vehicle had a reasonable expectation of privacy while driving the car over public streets, the Court (with Justice Scalia writing for the majority) concluded that attaching a GPS device to a target car constituted a physical intrusion upon the vehicle owner’s private property. Id. (“The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a ‘search’ within the meaning of the Fourth Amendment when it was adopted.”).
Justice Alito concurred in the judgment, but did not join the majority’s opinion. Id. at 957 (Alito, J., concurring). In his opinion — joined by Justices Ginsburg, Breyer, and Kagan — the appropriate Fourth Amendment analysis was the “reasonable expectation of privacy” inquiry under Katz. The outcome would be no different if the Court had applied Katz, the concurrence argued, because “society’s expectation has been that law enforcement agents and others would not — and indeed, in the .main, simply could not — secretly monitor and catalogue every single movement of an individual’s car for a very long period” of time. Id. at 964.
Justice Sotomayor, who joined the majority, also filed a concurrence. Id. at 954 (Sotomayor, J., concurring). And while she agreed with portions of Justice Alito’s reasoning, she nonetheless rebuked the concurring Justices for potentially countermanding an “irreducible constitutional minimum: When the Government physically invades personal property to gather *197 information, a search occurs.” Id. at 955. Moreover, Justice Sotomayor argued that GPS devices present law-enforcement agencies with a low-cost, low-resource method of tracking citizens. As such, even short-term surveillance constituted an impermissible search under the Fourth Amendment. Id. at 955-57 (calling, also, for potentially reassessing the privacy interests individuals enjoy in information disclosed to third parties so as to account for the new realities of the digital age).
Among the issues that Jones left open, however, was whether warrantless use of GPS devices would be “reasonable — and thus lawful — under the Fourth Amendment [where] officers ha[ve] reasonable suspicion, and indeed probable cause” to execute such searches. Id. at 954 (citation and internal quotation marks omitted). The instant case squarely presents this very issue for our consideration.[2] We therefore turn now to a consideration of the Fourth Amendment’s warrant requirement and the various — albeit circumscribed — exceptions thereto.
B. The Warrant Requirement and Its Exceptions
The Fourth Amendment does not protect individuals from all searches, just unreasonable ones. Indeed, as the Supreme Court has noted: “[T]he ultimate measure of the constitutionality of a governmental search is ‘reasonableness.’ ” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). “[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Id. at 652-53, 115 S.Ct. 2386 (internal quotation marks omitted). Under this “general ... approach,” courts look to the “totality of the circumstances” in performing this balancing test. United States v. Knights, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (internal quotation marks omitted).
More often than not, courts “strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment.” Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Thus, “[i]t remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.” United States v. Harrison, 689 F.3d 301, 306 (3d Cir.2012) (internal quotation marks omitted). This protection applies to both “‘houses’ and ‘effects,’ ” barring the presence of some “ ‘exceptional circumstances’ ” that would permit an exception. See United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951) (quoting Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).
We therefore begin with the following observation: under the physical intru *198 sion theory of the Fourth Amendment, the police actions in this case—ie., physical entry upon and occupation of an individual’s house or effects for purposes of ongoing GPS tracking—are highly disconcerting. In Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the police, acting without a warrant, had surreptitiously driven a “spike mic” (a long spike capable of picking up sound) through the wall of a neighboring house and into the heating duct of the defendant’s home. Id. at 506-07, 81 S.Ct. 679. The Court proclaimed this to be “beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other than electronic means did not amount to an invasion of Fourth Amendment rights.” Id. at 509-10, 81 S.Ct. 679; id. at 511-12, 81 S.Ct. 679 (“This Court has never held that a federal officer may without warrant and without consent physically entrench into a man’s office or home, there secretly observe or listen, and relate at the man’s subsequent criminal trial what was seen or heard.” (emphasis added)). While the Fourth Amendment recognizes a difference between the invasion of a “store, dwelling house, or other structure ... of which a ... warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile ... where it is not practicable to secure a warrant,” that difference, on its own, still mandates that a warrantless search of a car be based on probable cause—and, even then, only in a highly circumscribed universe of cases. Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925).[3]
We thus have no hesitation in holding that the police must obtain a warrant prior to attaching a GPS device on a vehicle, thereby undertaking a search that the Supreme Court has compared to “a constable’s concealing himself in the target’s coach in order to track its movements.” Jones, 132 S.Ct. at 950 n. 3. In the following section, therefore, we analyze whether any additional considerations weigh in favor of finding warrantless GPS searches to be reasonable.
1. Valid, Warrantless Searches Based on Less than Probable Cause
The Government first argues that the warrantless use of a GPS device in this case constitutes a reasonable search because the police action was based on reasonable suspicion.[4] In service of this argument, the Government posits that “[s]ince Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court has identified various law enforcement actions that qualify as Fourth Amendment searches or seizures, but that may nevertheless be conducted without a warrant or probable cause.” (Appellant Br. at 23.) This is true. The Government cites to three general categories of cases that permit warrantless searches based on less than probable cause: “special needs” cases, decisions addressing circumstances in which individuals have lessened privacy interests, and the progeny of Terry v. Ohio. We consider each category in turn and find that none apply to the instant matter.
a. The “Special Needs” Cases
As the Supreme Court has explained: “We have recognized exceptions to th[e Warrant Clause] when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.” Skinner, 489 U.S. at 619-20, 109 S.Ct. 1402 *199 (internal quotation marks omitted) (collecting cases). Thus, so long as the “primary purpose” is not to “uncover evidence of ordinary criminal wrongdoing,” City of Indianapolis v. Edmond, 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), courts should “balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context,” Skinner, 489 U.S. at 619, 109 S.Ct. 1402. See also United States v. Ward, 131 F.3d 335, 342 (3d Cir.1997). Such “special needs” cases, many of which permit searches without any particularized suspicion, constitute a “closely guarded category” of Fourth Amendment jurisprudence. Ferguson v. City of Charleston, 532 U.S. 67, 77, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (internal quotation marks omitted).
In the instant case, the reasoning behind the “special needs” doctrine is inapposite. The Government cannot articulate a particularized interest, other than a generalized interest in law enforcement. Indeed, the Government contends that if officers are required to obtain a warrant and have probable cause prior to executing a GPS search, “officers could not use GPS devices to gather information to establish probable cause, which is often the most productive use of such devices.” (Appellant Br. at 27 (emphasis added).) This statement— which wags the dog rather vigorously— runs headlong into Ferguson’s admonition that, to qualify for a “special needs” exception, the primary purpose of a search cannot be to “generate evidence for law enforcement purposes.” 532 U.S. at 83, 121 S.Ct. 1281 (emphasis omitted); Edmond, 531 U.S. at 48, 121 S.Ct. 447 (finding that a search did not qualify under the “special needs” doctrine where the “primary purpose of the [search] is ultimately indistinguishable from the general interest in crime control”).[5]
b. Cases of Diminished Privacy Expectations
Still, the “special needs” cases are not the only decisions to permit warrantless searches based on less than probable cause. The Government also cites a number of cases that address situations where the targets of a search enjoyed a lower expectation of privacy.[6] See, e.g., United States v. Knights, 534 U.S. 112, 121, 122 5.Ct. 587, 151 L.Ed.2d 497 (2001) (“When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer’s significantly diminished privacy interests is reasonable.”). We do not think such reasoning is applicable to this case.
*200 The police executed a GPS search against an individual — Harry Katzin — -who, at least when the police attached the GPS device, enjoyed the full breadth of privacy interests owed to him under the Constitution. That the search was executed on a car is, likewise, unpersuasive. While the Supreme Court has acknowledged that individuals enjoy a lowered expectation of privacy in their cars, United States v. Chadwick, 433 U.S. 1, 12, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), abrogated by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), absent circumstances that are not present in this case, the police must still have probable cause, Acevedo, 500 U.S. at 579-80, 111 S.Ct. 1982.
c. Terry and Its Progeny
In no small part, the Government argues that the warrantless use of slap-on GPS devices is permissible based on reasonable suspicion under the principles of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In Terry, the Supreme Court held that a police officer could “stop” an individual on the street for questioning and then “frisk” him to ascertain whether the individual was carrying weapons. Terry, 392 U.S. at 22-27, 88 S.Ct. 1868. More specifically, the Court held that a warrantless search — the stop — was permissible when based on less than probable cause if the “police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.” Id. at 30, 88 S.Ct. 1868. As for the search — the frisk — the Court explained that a search was permitted when the officer reasonably believed that “the person[] with whom he is dealing may be armed and presently dangerous ... and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others’ safety.” Id. Such a search, given that it is performed without probable cause, “must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a ‘full’ search.” Id. at 26, 88 S.Ct. 1868. The Terry framework has since expanded to include situations where, for example, an automobile has been stopped. See, e.g., Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); United States v. Yamba, 506 F.3d 251 (3d Cir.2007).
We find Terry and its progeny to be inapposite in this situation. While the frisk in Terry involved a pat-down of an individual, that search was limited to a specific instance in time (and limited to ascertaining whether the individual was armed or otherwise posed a danger to officer safety). A GPS search, in contrast, is an ongoing, vastly broader endeavor.[7] Cf. Berger v. New York, 388 U.S. 41, 59, 87 *201 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (noting that “eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures”). Over the course of the GPS tracker’s operation, the device can “generate[ ] a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.” Jones, 132 S.Ct. at 955 (Sotomayor, J., concurring).[8]
Ultimately, we disagree with the Government’s arguments advocating a “reasonable suspicion” standard. While the interests the police wished to further in this case are certainly important, the same interests arise in every investigation where the police have a potential suspect. We are hard pressed to say, therefore, that the police can — without warrant or probable cause — embark on a lengthy program of remote electronic surveillance that requires almost no law enforcement resources and physically intrudes upon an ordinary citizen’s private property. Consequently, we hold that — absent some highly specific circumstances not present in this case — the police cannot justify a warrantless GPS search with reasonable suspicion alone.[9]
2. Valid, Warrantless Searches Based on Probable Cause
As an alternative, the Government suggests that warrantless GPS searches can *202 be constitutional if the police have probable cause, pointing principally to a line of cases addressing the “automobile exception” to the warrant requirement.[10] We do not agree.[11]
Generally speaking, a warrant-less search is not rendered reasonable merely because probable cause existed that would have justified the issuance of a warrant. See Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); see also Johnson, 333 U.S. at 14, 68 S.Ct. 367 (“Any assumption that evidence sufficient to support a magistrate’s disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people’s homes secure only in the discretion of police officers.”). However, under the “automobile exception,” we permit “warrantless searches of any part of a vehicle that may conceal evidence ... where there is probable cause to believe that the vehicle contains evidence of a crime.” United States v. McGlory, 968 F.2d 309, 343 (3d Cir.1992) (internal quotation marks omitted); see also United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (“If probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.”); United States v. Burton, 288 F.3d 91, 100 (3d Cir.2002) (holding that warrantless searches of an automobile are permitted if “probable cause exists to believe it contains contraband” (internal quotation marks omitted)). That said, the Supreme Court has recognized that “[t]he word ‘automobile’ is not a talisman in whose presence the Fourth Amendment fades away and disappears.” Coolidge v. New Hampshire, 403 U.S. 443, 461-62, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (discussing the automobile exception in the context of exigent circumstances).[12] Indeed, the *203 automobile exception does not validate all warrantless automobile searches, but instead is “unquestionably [a] specifically established and well delineated” exception. Ross, 456 U.S. at 824, 102 S.Ct. 2157 (internal quotation marks omitted). Thus, “ ‘[t]he scope of a warrantless search of an automobile ... is defined by the object of the search and the places in which there is probable cause to believe that it may be found.’ ” Acevedo, 500 U.S. at 579-80, 111 S.Ct. 1982 (quoting United States v. Ross, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).
We hold that the automobile exception is inapplicable here. The key distinction in this case is the type of search at issue. While the Supreme Court has stated that the automobile exception permits a search that is “no broader and no narrower than a magistrate could legitimately authorize by warrant,” Ross, 456 U.S. at 825, 102 S.Ct. 2157, the search is still limited to a discreet moment in time. For example, the exception permits the police to enter upon and search a vehicle to ascertain whether it indeed contains the evidence that they suspect is inside. Thus, assuming — as we said we would — that the police had probable cause to believe that Harry Katzin’s van contained some form of contraband, they would have been justified in entering “any part of [the] vehicle that may conceal evidence.” McGlory, 968 F.2d at 343 (emphasis added). Attaching and monitoring a GPS tracker is different: It creates a continuous police presence for the purpose of discovering evidence that may come into existence and/or be placed within the vehicle at some point in the future.
It is no argument, then, to say that a GPS search presents the type of circumstances that usually trigger the automobile exception. It does not. While the police are still physically intruding into a target vehicle for evidence-gathering purposes, a GPS search extends the police intrusion well past the time it would normally take officers to enter a target vehicle and locate, extract, or examine the then-existing evidence.[13] For similar reasons, the case in favor of applying the automobile exception fares no better if we look to the “ready mobility” of the target vehicle. Burton, 288 F.3d at 100 (“[T]he ‘ready mobility’ of automobiles permits their search based only on probable cause.”); see also Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (noting that “the automobile does not have a separate exigency requirement,” partly because vehicles are “readily mobile”). Simply put: attaching and monitoring a GPS tracker does not serve the purposes animating the automobile exception. As has already been said: the automobile exception permits the police to intrude into a vehicle to retrieve or examine then-existing evidence. A GPS search does not deal with existing evidence, but with future evidence that the police suspect could come into being. That is a worthy goal, to be sure, but it cannot absolve law enforcement personnel of the warrant requirement. As the Government points out, the Supreme Court’s automobile exception de *204 cisions are “ ‘based on the practicalities of the situations presented.’ ” (Appellant Br. at 40 (quoting Ross, 456 U.S. at 807 n. 9, 102 S.Ct. 2157).) However, the Government seems to overlook that the power to create an ongoing, near-invisible police presence via a GPS tracker skews the “realistic appraisal of the ... protection that a contrary rule would provide” from the “relatively minor” to the decidedly major. (Id. (discussing protection for “privacy interests”).)
Additionally, we think that the “pervasive regulation of vehicles capable of traveling on the public roadways” is of no moment for purposes of the instant case. California v. Carney, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). True, such pervasive regulation gave rise to the understanding that an individual is “accorded less privacy in [his] automobile[ ].” Id. Indeed, this principle animated the Supreme Court’s statement that “[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.” Id. at 391, 105 S.Ct. 2066. Nevertheless, we still hold that a GPS search is sufficiently different from the type of search sanctioned by the automobile exception jurisprudence — and that, as a consequence, even the extensive scheme of regulation now affecting motorists does not permit the government to dispense with asking for permission from a neutral magistrate when seeking to physically intrude upon a target vehicle for longer than is necessary to locate, remove, and/or verify the presence of already-existing evidence of criminal wrongdoing. Cf. Delaware v. Prouse, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (noting, in the context of Terry stops, that “[w]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed”).[14]
Ultimately, in executing a GPS search, the police were not attempting to recover or ascertain the presence of evidence already present in Harry Katzin’s vehicle. If they were, the automobile exception would have sanctioned their search in so far as it allowed them to enter Harry Katzin’s van and retrieve and/or verify the presence or absence of the sought-after evidence. It would not (and, indeed, did not) permit them to leave behind an ever-watchful electronic sentinel in order to collect future evidence. Were we to hold otherwise, we would unduly expand the scope of the automobile exception well past its “specifically established and well delineated” contours, Ross, 456 U.S. at 824, 102 S.Ct. 2157, permitting the police to intrude indefinitely upon a target vehicle based solely on the prospect that it will, in the *205 future, contain some contraband or be used during the commission of a crime.
For these reasons we hold that the warrantless search in this case was not justifiable based solely on reasonable suspicion or probable cause, was thereby unreasonable, and consequently violated the Fourth Amendment.
IY. The Exclusionary Rule & the Good Faith Exception
Having held that the police were required to obtain a warrant prior to executing their GPS search of Harry Katzin’s van, we now consider whether the evidence uncovered as a result of their unconstitutional actions should be suppressed. We hold that it should.
A. Exclusionary Rule Jurisprudence
While the Fourth Amendment protects the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[, it] says nothing about suppressing evidence obtained in violation of this command.” Davis v. United States, — U.S. —, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (internal quotation marks omitted). Nevertheless, to “compel respect for the constitutional guaranty,” the Supreme Court created the exclusionary rule. Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). The rule mandates that evidence obtained in violation of the Fourth Amendment should not be available at trial. Herring v. United States, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). However, “that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies.” Id. at 140, 129 S.Ct. 695.
As the Supreme Court has made plain, “exclusion has always been our last resort, not our first impulse.” Id. (internal quotation marks omitted). To that end, the Supreme Court has recognized the existence of a “good faith” exception to the exclusionary rule in cases where the police “act[ed] with an objectively reasonable good-faith belief that their conduct [was] lawful.” Davis, 131 S.Ct. at 2427 (internal quotation marks omitted).[15] More specifically, the Supreme Court has held this exception to cover situations where law enforcement personnel have acted in objectively reasonable reliance on some seemingly immutable authority or information that justifies their course of action. See Davis, 131 S.Ct. 2419 (later-reversed binding appellate precedent); Herring, 555 U.S. 135, 129 S.Ct. 695 (undiscovered error in police-maintained database); Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (undiscovered error in court-maintained database); Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (subsequently overturned statute); United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (later-invalidated warrant).
To determine whether a particular situation is covered under this good faith exception, the Supreme Court has directed courts to consider whether exclusion would serve “to deter future Fourth Amendment violations.” Davis, 131 S.Ct. at 2426; see also Leon, 468 U.S. at 918, 104 S.Ct. 3405 (“If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, ... it must alter the behavior of individual law enforcement officers or the policies of their departments.”). Thus, in *206 analyzing whether the good faith exception applies, the Court balances “the benefits of the rule’s deterrent effects against the costs of exclusion, which include ‘letting guilty and possibly dangerous defendants go free.’ ” United States v. Tracey, 597 F.3d 140, 151 (3d Cir.2010) (quoting Herring, 555 U.S. at 141, 129 S.Ct. 695).
When considering the benefits gained from deterrence, we must necessarily consider the nature and culpability of the police conduct at issue. As the Supreme Court has explained, “police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” Herring, 555 U.S. at 144, 129 S.Ct. 695; Davis, 131 S.Ct. at 2429 (cautioning courts not to discourage “the officer from doing his duty” (alteration and internal quotation marks omitted)). Thus, “we apply the rule when police conduct is ‘deliberate, reckless, or grossly negligent,’ or when it will deter ‘recurring or systemic negligence.’ ” Tracey, 597 F.3d at 151 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695). On the other hand, isolated or attenuated acts of negligence do not warrant the rule’s application. Id.
In light of these principles, the Government argues that the police conduct at issue in this case does not rise to the level of culpability necessary for the exclusionary rule to apply and that, as a consequence, the balancing test outlined in Herring and Davis militates in favor of applying the good faith exception. In service of its argument, the Government urges that the police acted with an objectively reasonable good faith belief that their conduct was constitutional because “[bjefore Jones, every court of appeals to consider the question!, with the exception of one,] had concluded that, in light of the Supreme Court’s decision in [Knotts ], police did not need to obtain a warrant to install a GPS tracking device on the exterior of a vehicle or to use that device to monitor the vehicle’s movements on public roads.” (Appellant Br. at 48-49.) Indeed, the Government posits that this “consensus” among our sister circuits, coupled with the “guidance in Knotts and Katz,” absolves law enforcement personnel for purposes of the exclusionary rule. (Id. at 50, 55 n. 21; Oral Argument Tr. at 23.) We find the Government’s position unpersuasive and therefore hold that the good faith exception does not apply here.
B. Reliance on Beeper Cases
The Government posits that law enforcement personnel acted in good faith because they relied on, among other things, the Supreme Court’s “guidance” from Knotts that using an electronic tracking device does not violate the Fourth Amendment. (Appellant Br. at 55 n. 21.) Indeed, the Government observes that the reasoning from Knotts underpins the decision of “every court of appeals to consider” GPS tracking (save the D.C. Circuit). (Id. at 48-49.) We first ask ourselves, therefore, whether the Knotts decision — along with its sibling case, Karo — qualifies as binding precedent under Davis v. United States, wherein the Supreme Court held that the good faith exception covers police officers acting in reliance on later-invalidated binding appellate precedent. 131 S.Ct. 2419. As the forthcoming discussion demonstrates, we find that the explicit holding from Davis is inapposite because Knotts and Karo are both distinguishable given (1) the lack of a physical intrusion in those eases, (2) the placement by police of the beepers inside containers, and (3) the marked technological differences between beepers and GPS trackers.
In Davis, the police had executed a search of the defendant’s car subsequent to his arrest. At the time of the search, prevailing Supreme Court and Eleventh *207 Circuit precedent held that the police could lawfully search a suspect’s car incident to his arrest. See New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); United States v. Gonzalez, 71 F.3d 819 (11th Cir.1996). The defendant unsuccessfully challenged the search. While the defendant’s appeal was pending, the Supreme Court limited Belton, effectively restricting the areas of the car that the police were allowed to search after a suspect’s arrest. See Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). In deciding Davis, the Supreme Court reasoned that “Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules.” 131 S.Ct. at 2429 (internal quotation marks omitted). According to the Court, the police in Davis merely behaved as “reasonable officer[s] would and should act.” Id. (internal quotation marks omitted). Consequently, the Court found that “[t]he deterrent effect of exclusion in such a case can only be to discourage the officer from do[ing] his duty,” which was not “the kind of deterrence the exclusionary rule seeks to foster.” Id. (internal quotation marks omitted). Ultimately, therefore, the Court deemed that the police in Davis were covered by the good faith exception to the exclusionary rule and evidence recovered pursuant to the search was not suppressed. Id.
Of great significance to the instant case is the fact that in Davis the police relied on binding appellate precedent that “specifically authorize [d the] particular police practice.” Id. at 2429 (first emphasis added). Indeed, as Justice Sotomayor noted in her concurrence, Davis did not “present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled.” Id. at 2435 (Sotomayor, J., concurring).[16] By its plain terms, therefore, the express holding in Davis is inapposite to this case because Knotts and Karo do not qualify as appropriate binding appellate precedent: Neither case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver (all with the container owner’s permission). See Karo, 468 U.S. at 708, 104 S.Ct. 3296; Knotts, 460 U.S. at 278, 103 S.Ct. 1081. Additionally, both Karo and Knotts addressed the use of beepers, which — -as we have already explained — are markedly different from GPS trackers. See Maynard, 615 F.3d at 556-57.
Davis extends good faith protection only to acts that are explicitly sanctioned by clear and well-settled precedent, and neither Knotts nor Karo sanction the type of intrusion at issue in this case. Conse *208 quently, we hold that law enforcement’s reliance on the beeper cases, standing on its own, cannot sufficiently insulates the GPS search in this case from the exclusionary rule.
C. Reliance on Out-of-Circuit GPS Cases
We therefore consider the Government’s contention that the good faith exception applies because the police acted in objectively reasonable reliance on out-of-circuit precedent sanctioning warrantless GPS surveillance. (Appellant Br. at 15-16 (“Before [Jones ], all but one of the courts of appeals to have addressed the issue had approved the warrantless installation and monitoring of a GPS device on a vehicle.... [T]he agents’ reliance on this body of case law was objectively reasonable....”).) And while the Government relies, in no small part, on the reasoning in Davis for support, we think that reading Davis so broadly would strain its reasoning, to say nothing of its holding.[17]
The Davis decision hinged on the understanding that “Responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules.” Id. (internal quotation marks omitted). At the most basic level, then, the applicable body of “Fourth Amendment precedent” to which the responsible officer must conform consists of those decisions that are binding on the officer’s jurisdiction. Accord Hudson v. Michigan, 547 U.S. 586, 599, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (noting that officers are expected to learn and abide by “what is required of them” by courts having jurisdiction over them).
Thus, as already stated, the Court in Davis recognized that the good faith exception applies to situations where the police “conducted a search in objectively reasonable reliance on binding appellate precedent,” 131 S.Ct. at 2434, because “[t]he deterrent effect ... in such a case can only be to discourage the officer from doling] his duty,” which was not “the kind of deterrence the exclusionary rule seeks to foster,” id. at 2429 (internal quotation marks omitted). The same cannot be said where the law is unsettled in a particular jurisdiction, even where persuasive authority may exist in the form of decisions by other circuit courts.
Indeed, extending the rationale from Davis to cover reliance on out-of-circuit precedent would turn this principle on its head: Though our first and last word on the matter is that warrantless GPS searches are unconstitutional, in effect the Government argues that our sister circuits’ decisions should control whether the evidence is excluded. This rule would eviscerate the notion that clear and well-settled precedent should control and thus contradicts the basic principles of stare decisis. We respect our sister circuits, but their decisions cannot dictate our eonclu *209 sions. As such, any law enforcement officer who acts primarily in reliance on the Fourth Amendment proclamations of our sister circuits does so at his own peril for purposes of the exclusionary rule.
This is particularly true where, as in this case, our sister circuits are split on the relevant issue. The GPS search of Harry Katzin’s van occurred in late 2010. By that time, four of our sister circuits — the Seventh, Eighth, Ninth, and D.C. Circuits — had addressed GPS surveillance. Of those, three circuits had held that GPS surveillance either did not constitute a search or, even if it did, that the police did not require a warrant. See McIver, 186 F.3d 1119; Garcia, 474 F.3d 994; Pineda-Moreno, 591 F.3d 1212; Marquez, 605 F.3d 604.
At the same time, the D.C. Circuit had held in United States v. Maynard (which became Jones on appeal to the Supreme Court) that GPS surveillance did constitute a search and that the police did require a warrant. Maynard, 615 F.3d 544. At bottom, then, the Government seems to argue that reliance on a majority of a minority of our sister circuits is sufficient to escape the exclusionary rule. This cannot be. Although we find it commendable that law enforcement personnel would take the time to pore over out-of-circuit decisions relating to police procedures, it is not their duty for purposes of the exclusionary rule to parse and weigh the decisions of our sister circuits in an attempt to predict what this Court (or even the Supreme Court) would say if faced with a similar case.[18]
Moreover, we cannot burden district courts with the type of case-by-case assessment that the Government’s position would require. Unlike the archetypal situations in Leon or Davis, finding that the good faith exception applies in this case would, of necessity, require courts ruling on suppression motions to discern what amounts to sufficient out-of-circuit authority for purposes of an objectively reasonable good faith belief. Thus, district courts would need to consider how many circuits had addressed the police practice in question, what each one had said, whether the statements were mere dicta, and myriad other factors. Such an approach has no limiting principle and defies rational application. Surely police reliance on a single out-of-circuit decision could not support good faith, but what about two? If the circuits split two-to-one, that would *210 present yet another problem. And what if our sister courts had all ruled in near-unanimity on a point, with one stalwart (perhaps, highly persuasive) holdout? Is the presence of good faith to be decided with an abacus or does the strength of each court’s argument bear consideration? Because we foresee that it could lead to a sprawling, amorphous, and self-contradicting doctrine, we decline to adopt the Government’s position and hold that reliance on out-of-cireuit precedent (even where there is a so-called “consensus”) cannot, in and of itself, support application of the good faith exception.[19]
D. Exclusion based on Culpability and Deterrence
Up to this point we have considered only whether reliance by law enforcement personnel on out-of-circuit or distinguishable authority, by itself, suffices for purposes of the good faith exception. Per the previous discussion, we hold that such reliance is insufficient to support a per se finding of good faith.[20] The Supreme *211 Court in Herring and Davis, however, recognized that the good faith exception inquiry requires more. That is, in determining whether law enforcement personnel acted “with an objectively ‘reasonable good-faith belief that their conduct [was] lawful,” we must consider whether the totality of circumstances is greater than the sum of its attendant parts. See Davis, 131 S.Ct. at 2427 (quoting Leon, 468 U.S. at 909, 104 S.Ct. 3405). We therefore undertake the balancing test outlined in Herring and Davis, and ask whether — in light of all the circumstances — the police activity in this case rises to the level of a “deliberate, reckless, or grossly negligent” violation of the Fourth Amendment. See Herring, 555 U.S. at 144, 129 S.Ct. 695; Tracey, 597 F.3d at 151. We hold that it does.
Per the Government’s argument, the legal landscape in this case predominantly consisted of the out-of-circuit GPS cases, the Supreme Court’s beeper decisions, and the overarching privacy expectation framework for Fourth Amendment analysis adopted in Katz and deemed to be the sole rubric for analysis until Jones.[21] (See, e.g., Appellant Br. at 44, 50, 55 n. 21; Oral Argument Tr. at 23.) Taken together, the Government contends, these sources of legal authority would lead a reasonable law enforcement officer to conclude that he was acting within the confines of the constitution when attaching a GPS tracker to the undercarriage of Harry Katzin’s van. We find that, on balance, this collection of authority does not warrant applying the good faith exception. Try as we might to allay our concerns, we remain supremely discomfited by the lack of binding appellate guidance underlying the police action at issue in this case. Therefore, we hold that the police acted with sufficient constitutional culpability to require exclusion and, more importantly, that suppression in this case would help deter future Fourth Amendment violations.
Law enforcement personnel can rightly rely on a number of sources for Fourth Amendment guidance — including on-point decisions by the Supreme Court and this Circuit, warrants, and statutes. We, both as a Court and as a society, expect that law enforcement officers will consult these sources — it is a part of how we expect reasonable officers to act. Davis, 131 S.Ct. at 2429. Deterring such activity, therefore, would not serve the purposes of the exclusionary rule. Id. This ease, as we have just mentioned, is different. Nothing in a law enforcement officer’s duties forces him to either rely on non-binding precedent or to conduct the Fourth Amendment calculus himself by extrapolating from, or analogizing to, existing case law. Where an officer decides to take the Fourth Amendment inquiry into his own hands, rather than to seek a warrant from a *212 neutral magistrate — particularly where the law is as far from settled as it was in this case — he acts in a constitutionally reckless fashion.
Here, law enforcement personnel made a deliberate decision to forego securing a warrant before attaching a GPS device directly to a target vehicle in the absence of binding Fourth Amendment precedent authorizing such a practice. Indeed, the police embarked on a long-term surveillance project using technology that allowed them to monitor a target vehicle’s movements using only a laptop, all before either this Circuit or the Supreme Court had spoken on the constitutional propriety of such an endeavor. (That the surveillance lasted only a few days is mere coincidence.[22]) True, the police did not act in a total vacuum, but their chosen course of action when presented with such a novel constitutional situation is nonetheless troubling: In lieu of a binding proclamation from either this Circuit or the Supreme Court — and instead of seeking approval from a neutral magistrate — law enforcement personnel looked to other (non-binding or distinguishable) authorities like our sister circuits’ decisions. Essentially, they extrapolated their own constitutional rule and applied it to this case. We fail to see how this absolves their behavior. The assumption by law enforcement personnel that their own self-derived rule sanctioned their conduct — to say nothing of their unstated belief that this Circuit would automatically side with a majority of the minority of our sister circuits — was constitutionally culpable.[23]
The decisions in Knotts and Katz do not remedy the situation. The Government suggests that in this case law enforcement personnel properly reasoned that the GPS search did not require a warrant by analogizing to Knotts’ discussion of electronic *213 tracking devices. Doing so, the Government adds, was imminently reasonable given the prevailing Fourth Amendment framework at the time — the privacy theory from Katz. That is, the Government contends that because law enforcement personnel were aware that a search occurs when the police intrude upon a target’s reasonable expectation of privacy, they acted in good faith by relying on our sister circuits’ GPS decisions as well as Knotts ’ statement that, among other things, “[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Knotts, 460 U.S. at 281, 103 S.Ct. 1081. We find such reasoning dangerous for the reasons already articulated above: Law enforcement can always derive some constitutional principle from existing decisions — which is particularly true when they also look directly to a generalized baseline case like Katz. It cannot be that the good faith exception applies in every instance when the police act in reliance on such a self-derived principle. If it did, then all Fourth Amendment protections would be rendered ineffective— the police could intrude upon anyone’s Fourth Amendment rights without fear of suppression merely by relying on a particularly broad-sweeping, self-derived constitutional principle. We fear that accepting the Government’s position, in effect, would lead to the good faith exception swallowing the exclusionary rule.[24]
Moreover, since such constitutionally reckless action was the Government’s default choice in this case, we hold that applying the exclusionary rule aptly serves its intended purpose: to “deter future Fourth Amendment violations.” Davis, 131 S.Ct. at 2426; see also id. at 2435 (Sotomayor, J., concurring) (“[W]hen police decide to conduct a search or seizure in the absence of ease law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations----”). The police practice at issue here effectively disregarded the possibility that we could find a GPS search to constitute a Fourth Amendment violation requiring a warrant. But a Fourth Amendment violation is a Fourth Amendment violation. While the police may feel free to act with impunity, confident in the illusory protection of non-binding precedent, each search could still be violating the Constitution. Thus, where we have not yet ruled on the constitutionality of a police tactic, law enforcement personnel have two choices: (a) assume that their conduct violates the *214 Fourth Amendment and that we will require them to obtain a warrant, or (b) gamble, at the risk of having evidence excluded, that we will find no Fourth Amendment violation in a particular situation.[25] This is in line with the Supreme Court’s suggestion that law enforcement officials should be incentivized to “err on the side of constitutional behavior.” United States v. Johnson, 457 U.S. 537, 561, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).[26] Excluding the evidence in this case would incentivize just that and would therefore result in “appreciable deterrence” of future Fourth Amendment violations. Leon, 468 U.S. at 909, 104 S.Ct. 3405 (internal quotation marks omitted).
Thus, heeding the Supreme Court’s views in Herring and Davis, and after considering the Government’s various arguments, we find that the “deterrent effect of suppression [in this case is] substantial and outweigh[s] any harm to the justice system.” Herring, 555 U.S. at 147, 129 S.Ct. 695. The police acted in the face of unsettled law at a time when courts were becoming more attuned to the argument that warrantless GPS surveillance violated the Fourth Amendment. Excluding the evidence here will incentivize the police to err on the side of constitutional behavior and help prevent future Fourth Amendment violations. We therefore conclude that the police actions taken here do not qualify under the good faith exception and hold that the exclusionary rule should apply in this case.[27]
*215 V. STANDING AND THE KATZIN BROTHERS
Fourth Amendment rights are personal rights, and a defendant seeking to suppress evidence must therefore demonstrate a violation of his own Fourth Amendment rights before he can be granted any form of relief. See Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); United States v. Mosley, 454 F.3d 249, 253 (3d Cir.2006). Thus, having held that the District Court rightly suppressed the evidence found in Harry Katzin’s van, we must now consider whether all three of the brothers had standing to challenge the admissibility of this evidence. The Government would have us divide the stop into two distinct incidents: (1) the stop of Harry Katzin and (2) the stop of Mark and Michael Katzin, with each stop presenting a different constitutional situation. For the reasons discussed below, we hold that the stop of Harry Katzin’s van must be treated as a single incident impheating the Fourth Amendment rights of all three brothers and, consequently, we find that all three had standing.
We begin by stating the obvious: There is not, nor can there be, any dispute as to whether Harry Katzin — as the owner of the van — has standing to challenge the constitutionality of the GPS search as well as the stop and subsequent search of his van, and to seek suppression of any evidence discovered within the vehicle. Indeed, the Government concedes as much. (Appellant Br. at 69.) Certainly, then, the District Court rightly suppressed the evidence as against Harry Katzin.
The Government does challenge the standing of Mark and Michael Katzin. (Id. at 67-74.) Since “a search of a car does not implicate the rights of non-owner passengers,” the Government contends that such passengers are “generally held to lack ‘standing’ to object to evidence discovered in a search of a vehicle.” Mosley, 454 F.3d at 253 (citing Rakas v. Illinois, 439 U.S. 128, 147, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). This much is true. However, we have also held that “when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged.” Id. at 251.[28]
This Court in United States v. Mosley considered the illegal stop and subsequent search of a vehicle carrying three individuals, during the course of which the police discovered several firearms from the car. We held that the stop and subsequent search of the car was to be treated as a single event, thereby rejecting an approach that would split the inquiry between several “individual constitutional violations, each with [its own] victim, each of whom may seek to suppress only the fruits of the violation of his individual rights.” Id. at 257-58. In part, this conclusion was occasioned by our holding that “[t]he relationship between the seizure of a passenger in a moving vehicle, which necessarily occurs when that vehicle is stopped by the police, and the subsequent discovery of evidence during that stop, is one of ineluctable and undeniable correlation.” Id. at 266. Additionally, while we acknowledged *216 that “Fourth Amendment rights are personal rights,” we also expressly rejected “blind adherence to a phrase which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth' Amendment.” Id. at 267 (quoting Rakas, 439 U.S. at 147, 99 S.Ct. 421). In light of our decision in Mosley, Mark and Michael Katzin argue that they have standing to challenge the admissibility of evidence seized from Harry Katzin’s van by virtue of being subjected to an illegal stop that thereby rendered any evidence discovered in Harry Katzin’s van fruit of the poisonous tree. Id. at 256 (“Where the traffic stop itself is illegal, it is simply impossible for the police to obtain the challenged evidence without violating the passenger’s Fourth Amendment rights.”) We agree.[29]
True, precedent exists to support the proposition that an individual cannot challenge the legality of a search which was executed based on information obtained as a consequence of some illegal search or seizure of a third party. See, e.g., United States v. Chase, 692 F.2d 69, 70-71 (9th Cir.1982). Such holdings are premised on the principle underlying the Government’s position: Fourth Amendment rights “are personal and may be enforced by exclusion of evidence only by one whose own legal rights and interests were infringed by the search and seizure.” Id. (discussing Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421). The presence of Mosley, however, alters this analysis.
The Government effectively contends that we must treat the stop of Harry Katzin’s van as constituting two stops: The first, a stop (i.e., seizure) of Harry Katzin himself as a result of the GPS search. The second, a stop of Mark and Michael Katzin based on the probable cause developed through use of information derived from the GPS search. The Government would have us evaluate the legality and attendant Fourth Amendment consequences (if any) of each stop individually. We rejected this individualized approach in Mosley, holding instead that “an illegal traffic stop of a car occupied by a driver and a passenger [constitutes] a single constitutional violation, with [multiple] victims, each of whom can seek to suppress all fruits of that violation.” Mosley, 454 F.3d at 257-58; id. at 267 (“It defies common sense and common experience to transmute one action into three, and we will not endorse a Fourth Amendment approach that relies on such a transmutation.”) In effect, then, the illegality of the stop as it related to Harry Katzin is extended to his brothers (passengers). Consequently, we hold that Mark and Michael had standing to contest the stop and that the District Court rightly suppressed the evidence as to all three brothers.
VI. CONCLUSION
For the reasons discussed above, we will affirm the District Court’s suppression of evidence discovered inside of Harry Katzin’s van.

. We note that, at times, the Supreme Court has referred to this theory in the language of “trespass” rather than physical intrusion. Compare Jones, 132 S.Ct. at 949-50, with Florida v. Jardines, - U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). As the law currently stands, we think the latter term' — "physical intrusion” — is the more appropriate. See Jardines, 133 S.Ct. at 1420-21 (Alito, J., dissenting) (criticizing the Supreme Court’s most recent application of the physical intrusion theory and noting that “trespass law provides no support for the Court’s holding today”); Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (”[W]e need not pause to consider whether or not there was a technical trespass under the local property law relating to party *194 walls. Inherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort or real property law.” (footnote omitted)).

. At the time of this writing, we are not aware of — nor has either party brought to our attention — any decision by one of our sister circuits that directly and definitively resolves the matter. As our brethren in the First Circuit noted earlier this year:
Few courts (and no circuits that we know of) have grappled with the warrant question so far, largely because the searches at issue in recent cases occurred pre-/ones, allowing the govemment to argue, and a number of courts to find, that the good-faith exception [to the exclusionary rule] would apply even if the searches were unconstitutional.
United States v. Sparks, 711 F.3d 58, 62 (1st Cir.2013). As we explain at greater length below, we do not believe that the good-faith exception applies in this case and consequently take on the warrant issue.

. We address the “automobile exception,” first recognized in Carroll, in greater detail below.

. We assume, without deciding, that the police had reasonable suspicion for purposes of our analysis.

. The Government contends that requiring a warrant prior to GPS searches would "seriously impede the government’s ability to investigate drug trafficking, terrorism, and other crimes.” (Appellant Br. at 27.) We fail to see how such a conclusory assertion suffices to except GPS searches from the requirements of the Fourth Amendment's Warrant Clause. Doubtless, we are aware of the dangers posed by terrorism and comparably reprehensible criminal activity. However, we would work a great disservice by permitting the word "terrorism” (in the absence of any other information or circumstance) to act as a skeleton key to the liberties guaranteed under the Constitution.

. The seemingly paradoxical exercise of analyzing a search based on physical intrusion under the rubric of privacy expectations does not escape our notice. Still, as the Supreme Court noted in Jones: "The Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassoiy test.” Jones, 132 S.Ct. at 952. Moreover, we note that even before Katz, the Supreme Court was balancing the "need for effective law enforcement against the right of privacy” in considering whether a particular situation constituted an exception to the Fourth Amendment’s warrant requirement. Johnson, 333 U.S. at 14-15, 68 S.Ct. 367 (considering warrantless searches based on probable cause).

. The Government argues that “[a] Terry search is the paradigmatic example of a law enforcement action, absent 'special needs' ..., in which the balancing of law enforcement interests and privacy rights yields a standard less than probable cause.'' (Appellant Br. at 33.) This is incorrect. While the Court found that the "stop” was permissible despite merely serving a "legitimate investigative function,” that same rationale did not apply to the "frisk.” Terry, 392 U.S. at 22-24, 88 S.Ct. 1868. Rather, the Court explicitly noted, in evaluating the search of an individual’s person, that it was "now concerned with more than the governmental interest in investigating crime.” Id. at 23, 88 S.Ct. 1868 (emphasis added). Specifically, the Terry court looked to the "more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.” Id. The police, in attaching a GPS device to a car, are not looking for weapons and generally are not attempting to safeguard anyone's immedi *201 ate safety — they are attempting to investigate crime.

. The Government also seems to suggest that our evaluation should turn on how long the GPS unit remained attached to Harry Katzin’s van. (Appellant Br. at 25.) It is unclear, however, whether such a test would prove workable. It is not apparent whether, pursuant to such a test, the government would need to know how long a GPS search would last or whether they could, upon reaching some threshold duration, request a warrant from the courts for further GPS surveillance. We need not definitively resolve this question now, however. In this case, it was only by dint of coincidence that the GPS surveillance lasted for a mere handful of days.

. In support of its position, the Government points to the Eighth Circuit’s decision in Marquez and the Fifth Circuit’s decision in Michael. In Marquez, the court suggested that "[w]hen electronic monitoring does not invade upon a legitimate expectation of privacy, no search has occurred.” 605 F.3d at 610 (”[W]hen police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time.”). In Michael, the Fifth Circuit explained that the "reduced” expectation of privacy with respect to the movement of an automobile and the nonintrusive nature of the procedure permitted DEA agents to install a beeper on the defendant’s car. 645 F.2d at 257-58 ("The actual installation of the beeper was much less intrusive than the typical stop and frisk. Michael ... was not detained or questioned; he suffered no indignity; nothing from the interior of the van was seized or searched; indeed, nothing even from the van's exterior was removed.” (footnote omitted)).
The Government's reliance is misplaced. Both Michael and Marquez were decided pri- or to Jones, and thus did not have the benefit of: (a) the Court's reliance on the pre-Katz trespass theory of the Fourth Amendment or (b) Justice Sotomayor’s concurrence. Moreover, both cases are inapposite: In Marquez, the court found that the defendant lacked standing to challenge the use of the GPS device and therefore never reached the question of whether such use constituted an unreasonable search. 605 F.3d at 609. The Eighth Circuit’s discussion of reasonable suspicion is therefore dicta, coming only while the court was musing on what would happen “[e]ven if [the defendant] had standing.” Id. In Michael, the Fifth Circuit focused on a beeper — which is markedly different from a GPS device — and its decision is therefore distinguishable. 645 F.2d at 256-59. Additionally, both decisions run up against the holding in Maynard, where the D.C. Circuit explained that warrantless installation of a GPS device by the police was per se unreasonable under the Fourth Amendment. 615 F.3d at 566-67.

.We note that a warrantless search based on probable cause is also reasonable in the presence of certain "exigent circumstances” that "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.” Kentucky v. King, - U.S.-, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011) (internal quotation marks omitted). Such exigent circumstances include, but are not limited to, "hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others.” United States v. Coles, 437 F.3d 361, 366 (3d Cir.2006) ("In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion.” (footnote omitted)). In this case, we perceive (and the Government points to) no exigency that would have justified the police in immediately searching Harry Katzin’s van. We do not discount, therefore, the possibility that under highly specific circumstances — such as where life is on the line, say — the police can justify undertaking a warrantless GPS search based on probable cause.

. Here we also assume, without deciding, that the police had probable cause for purposes of our analysis.

. The automobile exception began as part of the "exigent circumstances” jurisprudence. Carroll, 267 U.S. at 153, 45 S.Ct. 280 (noting that the Fourth Amendment made a distinction for searches of automobiles since "it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought”). Later cases expanded on this rationale, adding further justification for why the police need not obtain a search warrant for the car. Most significantly, after the Katz decision had given precedential imprimatur to the language of "privacy,” the Court explained in United States v. Chadwick, that " '[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one’s residence or as the repository of personal effects.’ ” 433 U.S. at 12, 97 S.Ct. 2476 (quoting Cardwell v. Lewis, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)). Finally, the Supreme Court severed the connection between the automobile exception and exigent circumstances, holding that the exception *203 “has no separate exigency requirement” at all. Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999).

. We recognize that the Supreme Court has sanctioned warrantless searches under the automobile exception that, for example, have occurred some time after the police first impounded a vehicle. See, e.g., United States v. Johns, 469 U.S. 478, 485-88, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). We think this to be of no moment for our purposes. In cases such as Johns the search at issue still occurs at a specific point in time and is specifically limited in its scope to "places in which there is probable cause to believe that [contraband] may be found.” Id. at 485-86, 105 S.Ct. 881 (internal quotation marks omitted).

. The Government also points to New York v. Class, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), for the proposition that a warrantless, minimally intrusive search of a vehicle is permitted where the police have probable cause. (Appellant Br. at 37). In Class, the police had stopped a car for various traffic violations. After the driver exited the vehicle of his own accord, an officer approached the vehicle in order to copy the VIN number on the dashboard. Finding his view obscured, the officer reached into the car to move some papers and, in the process, observed the handle of a gun. Inevitable results followed. Class, 475 U.S. at 107-09, 106 S.Ct. 960. A brief look at the underlying reasoning of Class, however, demonstrates that it is inapposite: the Court reasoned that the brief search served several important government needs beyond a basic interest in law enforcement, including "the governmental interest in highway safety” and a "concern for the officers’ safety.” Id. at 118, 106 S.Ct. 960. Here, neither of the interests is directly served. Accord Jones, 132 S.Ct. at 952 (holding that Class is inapplicable to GPS searches because "attaching [a] device to the [car]" may have resulted in a different outcome).

. As the Supreme Court noted in Herring, “good faith exception” is somewhat of a misnomer. 555 U.S. at 142, 129 S.Ct. 695. The inquiry is not subjective at all, but instead looks to an officer's “objectively reasonable reliance.” Id. Nonetheless, because the Supreme Court (and our own decisions) use the terms interchangeably, we do so as well.

. We also note that the Eleventh Circuit's opinion in Davis was explicit on this point: "[We refuse] to apply the exclusionary rule when the police have reasonably relied on clear and well-settled precedent. We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation.” United States v. Davis, 598 F.3d 1259, 1266 (11th Cir.2010) (citations omitted) (emphasis added); see also United States v. Buford, 632 F.3d 264, 276 n. 9 (6th Cir.2011) (“Like the Eleventh Circuit, we also 'stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule’s operation.’" (quoting Davis, 598 F.3d at 1266)); United States v. McCane, 573 F.3d 1037, 1045 n. 6 (10th Cir.2009) (finding that the good faith exception applied because "Tenth Circuit jurisprudence supporting the search was settled. Thus, there was no risk that law enforcement officers would engage in the type of complex legal research and analysis better left to the judiciary and members of the bar”).

. We note that the majority in Davis itself suggested that its holding is inapplicable to the situation presented in this case. While explaining that its ruling will not deter defendants from challenging existing Fourth Amendment doctrine, the Supreme Court noted:
This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals. If one or even many of these courts uphold a particular type of search or seizure, defendants in jurisdictions in which the question remains open will still have an undiminished incentive to litigate the issue. This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted.
Davis, 131 S.Ct. at 2433 (emphasis added) (footnote omitted). Thus, the Court in Davis recognized that its holding was limited to jurisdictions where .the law was clearly settled.

. The Government urges that our analysis in United States v. Duka, 671 F.3d 329, 347 (3d Cir.2011) (addressing evidence obtained in a search pursuant to the Foreign Intelligent Surveillance Act (FISA)), supports the proposition that the reasoning from Davis is not limited to binding precedent. (Appellant Br. at 61-62 ("[The] insistence on binding authority does not accord with this Court’s approach following Davis .... [Duka ] undermines the district court’s position that reliance on non-binding case law ... is per se unreasonable.”).) This is not correct. Not only was the good faith discussion in Duka based on a different Supreme Court decision — Krull, which addressed objectively reasonable reliance on a later-invalidated statute — but the entire discussion of the good faith exception is dicta. See Duka, 671 F.3d at 346 (discussing the "good faith” exception only after noting that "[w]e are confident that FISA's 'significant purpose’ test satisfies the Fourth Amendment”). Moreover, the Government's argument seems to hinge on a footnote that contains the opinion's lone citation to Davis. In that footnote, this Court stated that "[t]he objective reasonableness of the officers' reliance on the statute in this case is further bolstered by the fact that the particular provision at issue has been reviewed and declared constitutional by several courts, going as far back as 2002.” Id. at 347 n. 12 (collecting cases). Since none of these "several courts” are the Third Circuit, the Government argues, Duka demonstrates our willingness to apply the rationale from Davis to non-binding authority. We think this makes a mountain out of a molehill: this single reference to Davis comes in dicta, in a footnote, as part of a "cf." citation.

. To see just how unwieldy the analysis could be, we need look no further than the Government’s own arguments in this case. At oral argument, the Government attempted to minimize the significance of Maynard, suggesting that this single decision had come too late in the process and was, ultimately, distinguishable. Such arguments would be disastrously disruptive to lower courts if we were to hold that reliance on out-of-circuit authority could, by itself, suffice for purposes of the good faith exception. How up-to-date must law enforcement be regarding the state of relevant legal principles? What if a decision were issued but either (a) was late in being added to a reporter/electronic database or (b) did not get sufficiently wide-spread exposure to bring it to the attention of police departments half-way across the country? Not only would district courts be forced to tally the authorities on either side of an issue like so many chit marks, but they would also have to decide whether decisions had come too late, or were perhaps too obscure.

. We note that some of our sister circuits have ruled otherwise, holding that, per Davis, pre-Jones warrantless GPS searches qualify for protection under the good faith exception. See United States v. Sparks, 711 F.3d 58 (1st Cir.2013); United States v. Andres, 703 F.3d 828 (5th Cir.2013); United States v. Pineda-Moreno, 688 F.3d 1087 (9th Cir.2012). These cases, however, do not deter us from our conclusion.
To begin with, all three courts relied on binding precedent within their own circuits. The Ninth Circuit noted that the police could rely on, among other things, Mclver for the proposition that "placing an electronic tracking device on the undercarriage of a car was neither a search nor a seizure under the Fourth Amendment.” Pineda-Moreno, 688 F.3d at 1090. The Fifth Circuit, which devoted a single paragraph to the discussion, based its conclusion on the presence of Michael, and its holding that " ‘reasonable suspicion is adequate to support warrantless beeper installation' on a suspect's vehicle parked in a public space.” Andres, 703 F.3d at 835 (quoting Michael, 645 F.2d at 257). Finally, the First Circuit based its decision to apply the good faith exception on the presence of "clear and apposite” authority, including a First Circuit decision that found " 'the lessened expectancy of privacy associated with motor vehicles justifies the use of beepers without a warrant to track vehicles ... only if the officers have probable cause at the time.'” Sparks, 711 F.3d at 65 (quoting United States v. Moore, 562 F.2d 106, 112-13 (1st Cir.1977)). At the same time, however, the First Circuit was far from certain that out-of-circuit precedent could support a finding of good faith, noting that "the two appellate courts to consider the question since Davis have read Davis to require reliance on the case law of the jurisdiction.” Id. at 63-64 & 63 n. 2 (internal quotation marks omitted).
Moreover, both the First and Fifth Circuits based their good faith exception determinations on cases dealing with beepers, with the First Circuit in Sparks going so far as to hold that Knotts was sufficiently "clear and apposite” so as to support a finding of good faith. Sparlcs, 711 F.3d at 65. As our foregoing discussion suggests: we disagree with this position. The difference between beepers and GPS trackers is one of kind, not degree. Any time technology shifts in this way, courts should expect that law enforcement will tread lightly and will refrain from reasoning by *211 (potentially ill-fitting) analogy. Cf. Kyllo v. United States, 533 U.S. 27, 35-36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (discussing the Court's reticence to “leave the homeowner at the mercy of advancing technology”).

. Our dissenting colleague points to a number of other decisions and Fourth Amendment doctrines which add further sauce to the Government's good faith goose. (See Dissent at 225-29 (discussing, for example, privacy considerations in the exterior of an automobile).) While we do not disagree that these too were part of the relevant legal landscape at the time the police executed their search, we nevertheless hold that — in light of our forthcoming discussion — such authority gets further and further afield of the relevant police conduct and could only supply marginal support to justify the police action.
The only possible exception is the advisory commentary on Federal Rule of Criminal Procedure 41. (Dissent at 230-31.) However, for the reasons articulated below, see infra note 24, we find that this commentary would not help the Government’s position — even assuming the Government had seen fit to cite (let alone mention) the language in its briefs or at oral argument.

. We therefore reject the Government’s attempts to distinguish Maynard. While it is true that the surveillance in Maynard lasted for nearly a month as compared to the several days in this case, it remains equally true that when the police attached their GPS device to Harry Katzin’s van, they had no way of knowing when the next Rite Aid robbery would take place. We likewise disagree with our Dissenting colleague’s assessment of Maynard. (Dissent at 229-30.) The good faith exception analysis cannot be post-hoc, and the police action at issue must be analyzed under the circumstances as they existed at the time the action was taken — in this case, before the police knew when their GPS surveillance would end.

. The Government suggests that the good faith exception should apply because the police sought confirmation from "experienced government attorneys.” (Appellant Br. at 56.) The Government cites Messerschmidt v. Millender, - U.S. -, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012), for the proposition that it shows good faith on the part of an officer if he obtains "approval of the warrant application from a superior and a prosecutor before submitting it to a magistrate.” (Appellant Br. at 57.) However, Messerschmidt is inapposite. That case considered good faith in the context of an officer relying on a warrant that had been based on an allegedly paltry affidavit. Thus, the opinion of a third party tended to demonstrate that the officer had not acted with knowledge of the affidavit’s deficiency. In the instant case, the police lack even an affidavit. Moreover, a government attorney’s approval, standing alone, cannot and should not suffice to demonstrate good faith. Cf. Leon, 468 U.S. at 914, 104 S.Ct. 3430 (“[T]he courts must also insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police.... [A magistrate] who acts instead as an adjunct law enforcement officer cannot provide valid authorization for an otherwise unconstitutional search.” (internal quotation marks omitted)). Thus, while we agree that it is another "factor to consider,” (Oral Argument Tr. at 51-52; Dissent at 33), we nonetheless hold that, in this case, seeking the advice of a “government attorney[]” does not offer much support to the Government’s position.

. The Dissent argues that Federal Rule of Criminal Procedure 41 — particularly the 2006 advisory committee notes to that rule — further supports a finding that the law enforcement officers in this case acted with an objectively good faith belief that their conduct was constitutional. (Dissent at 230-31.) In particular, the Dissent points to the following language from the 2006 advisory committee notes: "If ... the officers intend to install and use [a tracking device] without implicating any Fourth Amendment rights, there is no need to obtain a warrant.” Fed.R.Crim.P. 41(b) advisory committee’s note (2006) (citing Knotts, 460 U.S. 276, 103 S.Ct. 1081). This language, however, stands for nothing more than the unremarkable proposition that the police need not obtain a warrant if their action does not violate the Fourth Amendment. Without our (or the Supreme Court’s) having ruled on the matter, however, the police could not reasonably say that the use of a GPS tracker would not "implicate] ... Fourth Amendment rights.” Indeed, even under the most generous rationale, this language could only have favored the Government’s argument if the GPS search occurred prior to the Maynard decision (i.e., before any circuit had suggested that GPS searches violated the Fourth Amendment). However, once the circuits split on the issue of whether using a GPS tracker constitutes a search, law enforcement officials were on notice that such devices could “implicatfe] ... Fourth Amendment rights” and the commentary became borderline irrelevant for good faith purposes.

. We do not hold, of course, that the police can never make assumptions about our future Fourth Amendment rulings. We merely hold that where law enforcement personnel choose to take the constitutional analysis into their own hands, they effectively do so without a safety net: If their analysis is correct and we ultimately affirm the constitutionality of a search, then the police are rewarded with full use of any evidence derived from the search. If their analysis is wrong, however, and the search is ultimately held to be unconstitutional, then the police cannot avoid the cost of suppression by relying on the good faith exception. Just as the police enjoy the benefits when they are correct, so, too, do they bear the costs when they are wrong. Of course, the police can avoid this entire issue by requesting a warrant in the first instance.

. Johnson addressed retroactive application of Fourth Amendment decisions. In discussing the matter, the Court stated:
If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord any retroactive effect to Fourth Amendment rulings would encourage police or other courts to disregard the plain purport of our decisions and to adopt a let’s-wait-until-it's-decided approach.
Johnson, 457 U.S. at 561, 102 S.Ct. 2579 (footnote and internal quotation marks omitted).

.It bears noting that we do not deal here with a situation where some on-point binding precedent exists. That is, we are not presented with a case wherein law enforcement personnel were asked to apply on-point binding appellate law to a new factual scenario. Indeed, we recognize that applying existing precedential frameworks to subtle factual permutations is something that police officers— and other law enforcement personnel — do all the time. We have no occasion (or desire) to curtail such practices in this opinion. Thus, for example, we do not purport to limit the ability of an officer to decide whether a particular situation gives rise to exigent circumstances while standing outside an apartment door with suspicious sounds emanating from within. Such a case could lead to a different outcome under the Herring and Davis balancing test given that, unlike here, the officer would not be leaping recklessly into an unexplored constitutional situation.

. We explicitly noted in Mosley that courts “should not be distracted by the fact that this case involves evidence found in a car.” Mosley, 454 F.3d at 253. As Mosley explained, the constitutional violation stems not from the "search of the car ... [but] the seizure of [the passenger].” Id. at 253 & n. 6 ("[A] Fourth Amendment seizure of every occupant occurs the moment that vehicle is pulled over by the police.”) The same is true of the case at bar: while the police did search Harry Katzin’s van, this was done only after pulling the van to the side of the road, thereby “seizing” all three brothers.

. It bears noting that Mark and Michael Katzin challenge the stop of Harry Katzin’s van, not the GPS search itself. That in the course of challenging the stop this Court must necessarily consider the constitutionality of the GPS search is merely incidental: Mark and Michael seek to vindicate their own rights, not those of their brother.