11-5262-cr (L)
United States v. Aguiar

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: October 5, 2012      Decided: December 13, 2013)

Docket Nos.  11-5262-cr(L), 11-5329-cr (con), 11-5330-cr (con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

STEPHEN AGUIAR, WILLIAM MURRAY, and COREY WHITCOMB,

*Defendants-Appellants.*[1]

_____

Before: JACOBS, POOLER and HALL, *Circuit Judges*.

Appellants Steven Aguiar, William Murray, and Corey Whitcomb challenge their convictions in the United States District Court for the District of Vermont (Sessions, *J.*) on multiple charges related to their participation in a conspiracy to distribute cocaine and heroin.  Appellants' primary argument is that the warrantless placement of a global positioning system device ("GPS") on Aguiar's

_____

[1] The Clerk of the Court is directed to amend the caption as above.

vehicles constituted a search within the meaning of the Fourth Amendment, requiring the suppression of evidence collected by the government using data transmitted by the GPS. As we find the government's placement of the GPS device falls within the good-faith exception set forth in *Davis v. United States*, 131 S. Ct. 2419 (2011), we affirm the judgments of conviction.

Affirmed.

_____

DAVID J. WILLIAMS, Jarvis, McArthur & Williams LLC, Burlington, VT, *for Defendant-Appellant Stephen Aguiar*.

RICHARD C. BOTHFELD, Bothfeld & Volk, PC, Burlington, VT, *for Defendant-Appellant Corey Whitcomb.*

ROBERT S. BEHRENS, Burlington, VT, *for Defendant-Appellant William Murray.*

WENDY L. FULLER, Assistant United States Attorney, (Tristam J. Coffin, United States Attorney for the District of Vermont, Gregory L. Waples, Assistant United States Attorney, *on the brief*) Burlington, VT, *for Appellee.*

POOLER, *C.J.*:

Acting without a warrant, an agent from the Drug Enforcement Agency ("DEA") placed a global positioning system device ("GPS") on the Subaru Impreza driven by appellant Stephen Aguiar. The data gathered by the GPS aided law enforcement in identifying avenues of investigation, supported

applications for wiretap warrants, and led investigators to other evidence collected and introduced at trial.  Appellants sought to suppress the evidence gathered with the aid of GPS data, arguing that the placement and tracking violated the Fourth Amendment.  The United States District Court for the District of Vermont (Sessions, *J.*) denied the motion.  Aguiar and appellants Corey Whitcomb and William Murray were convicted on multiple counts flowing from a conspiracy to possess and distribute cocaine and heroin.

Following appellants' convictions, the Supreme Court handed down *United States v. Jones*, which held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for Fourth Amendment purposes.  132 S. Ct. 945, 949 (2012) (footnote omitted).  *Jones* left open the question of whether the warrantless use of GPS devices would be "reasonable—and thus lawful—under the Fourth Amendment [where] officers ha[ve] reasonable suspicion, and indeed probable cause" to conduct such a search.  *Id.* at 954 (internal quotation marks omitted).  As we find the government's actions in this case fall within the good-faith exception to the excusionary rule set forth in  *Davis v. United States*, 131 S. Ct. 2419 (2011), we decline to reach the issue of whether the search was

unconstitutional.[2]

## BACKGROUND

In mid-to-late 2008, members of the Burlington Police Department ("BPD") who were investigating a cocaine and heroin distribution ring focused their attention on leads indicating that Aguiar was transporting cocaine from Massachusetts into Vermont. William Murray was suspected of being one of Aguiar's main cocaine distributors, and Corey Whitcomb became a target of the investigation later on. Based on the information developed by BPD, in early 2009 the DEA joined the investigation.

On January 23, 2009, DEA agent Richard Carter installed a GPS device on Aguiar's Impreza without either a search warrant or consent. Carter later installed GPS trackers on other cars driven by Aguiar, and changed the batteries in the devices as needed. Once installed and activated, the GPS device transmitted a live signal to a DEA server, which showed the precise location of Aguiar's car in real time. Law enforcement agents were able to use the GPS data to remotely monitor the car's movements. The DEA developed software that

---

[2] The parties submitted several letters pursuant to Federal Rule of Appellate Procedure 28(j), which we considered in preparing this opinion.

allows agents to save, track and analyze the data generated by the GPS device. The DEA began receiving GPS data the day the device was attached, and continued to collect GPS data from Aguiar's vehicles until his arrest on July 30, 2009.

Using data generated by the GPS device, DEA agents were able to identify additional suspects and obtain pen register and trap and trace orders, as well as a Title III order allowing agents to wiretap Aguiar's cell phone. At trial, the government introduced various evidence developed with the aid of the GPS data, including maps depicting Aguiar's travel routes, surveillance photos, and testimony of officers who made visual observations of Aguiar and his activities.

Following their indictments and arrests, appellants moved to suppress the data collected from the GPS device. The district court denied the motion. It relied on *United States v. Knotts*, 460 U.S. 276, 281 (1983), for the proposition that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Seeing no material distinction between the beeper devices used to track vehicle movement in *Knotts* and the GPS devices used here, the district court ruled that the warrantless use of a tracking device on public roads did not violate the Fourth

Amendment.  Appellants were convicted after a jury trial, and this appeal followed.

## ANALYSIS

"We review the factual findings on which the district court's suppression ruling was based . . . for clear error, viewing the evidence in the light most favorable to the government; the legal conclusions on which this ruling was based are reviewed de novo."  *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 1995) (internal quotation marks, alteration and italics omitted).  The appellants here contest the denial of their motion to suppress the GPS data and evidence derived from that data, based on the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012).[3]  All seek to vacate their convictions and remand the case to the district court for a new suppression hearing.

## I.    The state of the law on tracking technology pre-*Jones*.

We start with an examination of the law prior to the decision in *Jones*, beginning with *United States v. Knotts*, 460 U.S. 276, 277 (1983).  In *Knotts*, the police

---

[3] The government argues that Whitcomb and Murray cannot challenge their convictions based on the GPS data because they do not have standing to contest a search of Aguiar's vehicle.  The district court granted Murray and Whitcomb's motions to join the challenge of the use of the GPS tracker, noting that their motions to join in that challenge were unopposed.  Because we find the good-faith exception applies, we assume without deciding that Whitcomb and Murray have standing to press their challenge.

6

were investigating a conspiracy to manufacture controlled substances, including methamphetamine. 460 U.S. at 277. With the permission of the container's owner, the police placed a beeper inside of a five gallon drum containing chloroform purchased by one of the defendants. When defendant picked up the container, the police followed the defendant's car by tracking the radio signal emitted by the beeper, and eventually tracked the container to a cabin used by the defendant. *Id.* at 278-79. The police then obtained a search warrant for the cabin, based in large part upon the data collected through use of the beeper. *Id.* at 279. Defendant sought to suppress the evidence obtained based on the warrantless monitoring of the beeper. The Supreme Court found no Fourth Amendment violation, stating that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id*. at 281.

The Supreme Court next addressed the issue in *United States v. Karo*, 468 U.S. 705 (1984), where a beeper was used to track an object inside of a private residence, rather than in a public area. As in *Knotts*, government agents installed a beeper inside a container, then used the beeper to track the movement of the container to various locations, including a number of private residences and a commercial storage facility. 468 U.S. at 708-10. Defendants moved to suppress the evidence collected from within one of the private residences, and the Supreme Court agreed that using the beeper to

7

monitor the movement of the container within private residences violated the Fourth Amendment. *Id.* at 714. The *Karo* Court held that "[a]t the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." *Id.* The *Karo* Court distinguished *Knotts*:

> The monitoring of an electronic device such as a beeper is, of course, less intrusive than a full-scale search, but it does reveal a critical fact about the interior of the premises that the Government is extremely interested in knowing and that it could not have otherwise obtained without a warrant. The case is thus not like *Knott*s, for there the beeper told the authorities nothing about the interior of Knotts' cabin. The information obtained in *Knott*s was "voluntarily conveyed to anyone who wanted to look . . .," 460 U.S., at 281, 103 S. Ct., at 1085; here, as we have said, the monitoring indicated that the beeper was inside the house, a fact that could not have been visually verified.

468 U.S. at 715.

After *Knotts* and *Karo*, tracking technology evolved and law enforcement began employing GPS devices instead of beepers. In *United States v. McIver*, the Ninth Circuit considered the argument that placing a GPS device on a vehicle constituted a trespass and rejected it because the vehicle was parked "outside the curtilage" of a home when the device was attached, such that defendant lacked "a legitimate expectation of privacy cognizable under the Fourth Amendment." *McIver*, 186 F.3d 1119, 1126 (9th Cir. 1999)

8

*abrogated by Jones*, 132 S. Ct. at 945.  Nor did placing the GPS device constitute an illegal search and seizure, as

> McIver did not produce any evidence to show that he intended to shield the undercarriage of his Toyota 4Runner from inspection by others. Furthermore, in placing the electronic devices on the undercarriage of the Toyota 4Runner, the officers did not pry into a hidden or enclosed area.

*Id.* at 1127.  In addition,

> McIver did not present any evidence that the placement of the magnetized tracking devices deprived him of dominion and control of his Toyota 4Runner, nor did he demonstrate that the presence of these objects caused any damage to the electronic components of the vehicle. Under these circumstances, we hold that no seizure occurred because the officers did not meaningfully interfere with McIver's possessory interest in the Toyota 4Runner.

*Id.*

The Ninth Circuit reached the same result in *United States v. Pineda–Moreno*, where the government conceded the appellant's car was parked within the curtilage of his home when the GPS device was placed.  591 F.3d 1212, 1214–15 (9th Cir. 2010), *vacated*, 132 S.Ct. 1533 (2012).   Finding the driveway where the vehicle was parked "had no gate, no 'No Trespassing' signs, and no features to prevent someone standing in the street from seeing the entire driveway," the Ninth Circuit concluded appellant lacked a reasonable expectation of privacy in the driveway.  *Id.* at 1215.   The Ninth Circuit also found that like the beeper at issue in *Knotts*,

9

[t]he only information the agents obtained from the [GPS] tracking devices was a log of the locations where Pineda-Moreno's car traveled, information the agents could have obtained by following the car. "Insofar as [Pineda-Moreno's] complaint appears to be simply that scientific devices such as the [tracking devices] enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality and decline to do so now."

*Id.* at 1216 (quoting *Knotts*, 460 U.S. at 284).

Similarly, in *United States v. Garcia*, the Seventh Circuit found the warrantless attachment of a GPS device to a vehicle was not a search. 474 F.3d 994, 996-97 (7th Cir. 2007), *abrogated by Jones*, 132 S. Ct. at 945. The Seventh Circuit found the GPS device merely acted as a "substitute . . . for an activity, namely following a car on a public street, that is unequivocally *not* a search within the meaning of the amendment." *Id.* at 997 (emphasis in the original).[4]

It was not until the D.C. Circuit issued its decision in *United States v. Maynard* in August of 2010 that a circuit court found attaching a GPS tracking device to a suspect's car violated the Fourth Amendment. 615 F.3d 544, 565 (D.C. Cir. 2010). The D.C. Circuit found that "the police used the GPS device . . . to track [defendant's] movements 24 hours a day for 28 days as he moved among scores of places, thereby discovering the

---

[4] In dicta, the Eighth Circuit also opined that placing a GPS tracking device on the bumper of a suspect's car did not violate the Fourth Amendment. *See United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir. 2010).

totality and pattern of his movements from place to place to place." *Id.* at 558. That

monitoring gave the police access to information not exposed to the public:

> First, unlike one's movements during a single journey, the
> whole of one's movements over the course of a month is not
> *actually* exposed to the public because the likelihood anyone
> will observe all those movements is effectively nil. Second,
> the whole of one's movements is not exposed constructively
> even though each individual movement is exposed, because
> that whole reveals more—sometimes a great deal more—than
> does the sum of its parts.

*Id.* (emphasis in the original). The *Maynard* court concluded that the warrantless use of

a GPS device to track a suspect's movements offended the Constitution, and further

found that the GPS data was essential to the government's case against defendant

Antoine Jones. *Id.* at 557–58. Accordingly, the court overturned the convictions

obtained against Jones based on those data.

The Supreme Court took up the case, now captioned *United States v. Jones*, 132 S.

Ct. 945 (2012). The Court held that "the Government's installation of a GPS device on a

target's vehicle, and its use of that device to monitor the vehicle's movements,

constitutes a 'search'" within the meaning of the Fourth Amendment. *Id.* at 949 (footnote

omitted). The Supreme Court explained that:

> [i]t is important to be clear about what occurred in this case:
> The Government physically occupied private property for the
> purpose of obtaining information. We have no doubt that
> such a physical intrusion would have been considered a
> "search" within the meaning of the Fourth Amendment when

11

it was adopted. *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765), is a "case we have described as a 'monument of English freedom' 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted, and considered to be 'the true and ultimate expression of constitutional law'" with regard to search and seizure.

*Id.* (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)). The Court rejected the government's argument that Jones lacked a reasonable expectation of privacy in the underbody of the Jeep to which the GPS device was attached

> because Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo, supra*, at 34, 121 S.Ct. 2038. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. *Katz* did not repudiate that understanding.

*Jones*, 132 S. Ct. at 950 (footnote omitted).

## II.     The state of the law post-*Jones*.

While *Jones* settled the issue of whether the warrantless use of a GPS device to track a suspect's movements constitutes a search within the meaning of the Fourth Amendment, *Jones* did not address the issue of whether the warrantless use of GPS devices would be "reasonable—and thus lawful—under the Fourth Amendment [where] officers ha[ve] reasonable suspicion, and indeed probable cause" to execute such a search. 132 S. Ct. at 954 (citation and internal quotation marks omitted). A warrantless

12

search is "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). "To safeguard Fourth Amendment rights generally, the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (internal quotation, citation and alteration omitted). However, "[t]he fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "Indeed, exclusion has always been our last resort, not our first impulse." *Id.* (internal quotation marks omitted). The exclusionary rule is subject to a good-faith exception, crafted by the Supreme Court in *Davis*, 131 S.Ct. 2419. Courts grappling with the issue of warrantless GPS searches conducted prior to *Jones* often found that their analysis turned on whether the good-faith exception applied. *See United States v. Sparks*, 711 F.3d 58, 62 (1st Cir. 2013) (noting few courts "have grappled with the warrant question so far, largely because the searches at issue in recent cases occurred pre-*Jones*, allowing the government to argue, and a number of courts to find, that the good-faith exception would apply even if the searches were unconstitutional.") *cert denied*, — S. Ct. — , No. 12-10957, 2013 WL 3230428 (Oct. 7, 2013).

13

The good-faith exception provides that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 131 S. Ct. at 2423–24. *Davis* involved officers who conducted a search of an automobile contemporaneously with an arrest, in accordance with binding circuit precedent. *Id.* As defendant's case progressed, that precedent was overruled, meaning the search at issue ended up violating the Fourth Amendment. Because the officer acted on good-faith reliance in the law at the time of the search, the *Davis* Court declined to suppress the evidence collected during that search as would ordinarily be required under the exclusionary rule. *Id.* at 2429. Noting that the exclusionary rule is a "prudential doctrine created by this Court to compel respect for the constitutional guaranty," with the goal of "deter[ring] future Fourth Amendment violations," *id.* at 2426 (internal quotation mark and citation omitted), the *Davis* Court stressed the goal of deterrence must be balanced against

> the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but

14

only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Id.* at 2427 (citations omitted). Invoking its decision in *United States v. Leon*, 468 U.S. 897 (1984), the Court observed:

The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, or when their conduct involves only simple, "isolated" negligence, the "deterrence rationale loses much of its force," and exclusion cannot "pay its way."

*Id.* at 2427-28 (internal citations omitted). Thus, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule" when those cases are later overturned. 131 S. Ct. at 2423-24.

Several of our sister circuits have applied the good-faith exception in cases where warrantless GPS searches were conducted pre-*Jones*, and did not require the evidence collected by those searches be suppressed. *See Sparks*, 711 F.3d at 62-63; *United States v. Andres*, 703 F.3d 828, 834-35 (5th Cir. 2013) *cert denied*, 133 S. Ct.

15

2814 (2013); *United States v. Pineda–Moreno*, 688 F.3d 1087, 1090-91 (9th Cir. 2012) *cert denied*, 133 S. Ct. 994 (2013). Several district courts have also applied the good faith exception to allow evidence obtained from pre-*Jones* warrantless GPS searches to stand. *See, e.g., United States v. Baez*, 878 F. Supp. 2d 288, 289 (D. Mass. 2012) ("Where, as here, law enforcement officers at the time they act have a good faith basis to rely upon a substantial consensus among precedential courts, suppression of probative evidence is too high a price to pay because of the subsequent supervention of that consensus by the Supreme Court."); *United States v. Leon*, 856 F. Supp. 2d 1188, 1193 (D. Haw. 2012) (as there was no binding precedent authorizing the practice at the time, *Davis* did not control, but "after examining precedent as of 2009, the court finds that the agents' conduct in the use of the GPS tracking device was objectively reasonable"); *United States v. Oladosu*, 887 F. Supp. 2d 437, 448 (D. R.I. 2012) (evidence would not be excluded where at the time the GPS device was attached to defendant's vehicle, the Supreme Court had approved the warrantless use of beeper technology and two circuit courts had extended that rule to GPS devices).

Other courts, however, adopted a much stricter rule, finding the precedent at issue must be (1) within the Circuit and (2) specific to the facts at hand. *United*

*States v. Katzin*, 732 F.3d 187, 210 (3d Cir. 2013). *Katzin* first held that "the police

must obtain a warrant prior to attaching a GPS device on a vehicle, thereby

undertaking a search that the Supreme Court has compared to 'a constable's

concealing himself in the target's coach in order to track its movements.'" *Id.* at

198 (quoting *Jones*, 132 S. Ct. at 950 n.3). The Third Circuit then declined to apply

the exclusionary rule, finding "*Knotts* and *Karo* are both distinguishable given (1)

the lack of a physical intrusion in those cases, (2) the placement by police of the

beepers inside containers, and (3) the marked technological differences between

beepers and GPS trackers." *Id.* at 206. *Katzin* also rejected reliance on out-of-

circuit cases, finding such reliance "would eviscerate the notion that clear and

well-settled precedent should control and thus contradicts the basic principles of

stare decisis." *Id.* at 208. A number of district courts have reached similar

conclusions. *See United States v. Robinson*, 903 F. Supp. 2d 766, 784 (E.D. Mo. 2012)

("holding in *Davis* extends only to 'binding' precedent"); *United States v. Lee*, 862

F. Supp. 2d 560, 569-70 (E.D. Ky. 2012) (limiting good-faith exception to binding

appellate precedent); *United States v. Lujan*, No. 2:11CR11-SA, 2012 WL 2861546 at

* 4 (N.D. Miss. 2012) ("although the placement and use of a GPS tracker in this

instance was *per se* unreasonable without a warrant under the Fourth

17

Amendment, because there was an independent basis for pulling Lujan over in Arkansas and separate probable cause (as well as valid consent) to search his vehicle, the evidence will not be suppressed").

## III.    Application of *Jones* and *Davis*.

The government here concedes, as it must, that post-*Jones* attaching a GPS tracking device to Aguiar's car without a warrant is a search within the meaning of the Fourth Amendment.  It urges us to find that its actions fall within a number of different execptions to the exclusionary rule.   As we agree with the government that the good-faith exception applies here, we do not reach any of its alternative arguments.

We start by addressing what is "binding appellate precedent" within the meaning of *Davis.*  In the context of statutory interpretation, "binding precedent" refers to the precedent of this Circuit and the Supreme Court.  *See  S.E.C. v. Dorozhko*, 574 F.3d 42, 46 (2d Cir. 2009).  Prior to *Jones*, our Circuit lacked occasion to opine on the constitutionality of using electronic tracking devices attached to vehicles, either of the beeper or GPS variety.  However, the Supreme Court did have occasion to address the issue in both *Knotts* and *Karo*, and we find that at the time the GPS tracking device was applied to Aguiar's car in January 2009, law enforcement could reasonably rely on that binding appellate precedent.

The Supreme Court's decision in *Knotts* stood for the proposition that the warrantless use of a tracking device to monitor the movements of a vehicle on public roads did not violate the Fourth Amendment. 460 U.S. at 281-82, 285. Further, *Karo* discounted the importance of trespass in placing a device, stating that "a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated." 468 U.S. at 712-13. *Karo*'s *de minimis* treatment of the trespass issue gave no indication that the issue of trespass would become the touchstone for the analysis in *Jones*. Moreover, *Karo*'s brushing off of the potential trespass fits logically with earlier Supreme Court decisions concluding that "the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein." *New York v. Class*, 475 U.S. 106, 112 (1986). Nor is there an expectation of privacy when a car "travels public thoroughfares where its occupants and its contents are in plain view," *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974). Taken together, law enforcement could reasonably conclude placing a GPS device on the exterior of Aguiar's vehicles did not violate the Fourth Amendment.

Moreover, we find the beeper technology used in *Knotts* sufficiently similar to the GPS technology deployed by the government here. *See, e.g., Sparks*, 711 F.3d

at 66 (finding defendants failed to distinguish in any substantive way how the installation of a beeper differed from the installation of a GPS device). Like the device at issue in *Knotts*, the GPS device allows law enforcement to conduct the same sort of surveillance it could conduct visually, but in a more efficient and cost-effective manner. Appellants argue that the GPS surveillance here continued over a period of months, tantamount to the sort of "dragnet type law enforcement practices" the *Knotts* court specifically declined to address. *Knotts*, 460 U.S. at 284. But the record indicates that the GPS device was used to track Aguiar's vehicles on public thoroughfares, with technology undertaking an activity that police officers would have physically performed in the past. "Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled police to be more effective in detecting crime, it simply has no constitutional foundation." *Id.*

Our conclusion that the officers here relied in good faith on *Knotts* in placing the GPS device on Aguiar's vehicles is reinforced by the fact that several sister circuits reached similar conclusions. *See Pineda–Moreno*, 591 F.3d at 1216–17 (holding that GPS tracking device used to monitor individual's movements in his vehicle was not a search, relying on *Knotts* ); *Garcia*, 474 F.3d at 997–98 (same); *see*

20

*also, e.g.*, *United States v. Jesus–Nunez*, No. 1:10–CR–00017–01, 2010 WL 2991229, at

* 5 (M.D. Pa. 2010); *United States v. Burton*, 698 F. Supp. 2d 1303, 1307–08 (N.D. Fla.

2010); *United States v. Moran*, 349 F. Supp. 2d 425, 467–68 (N.D.N.Y. 2005). These

cases are not binding precedent and thus do not control our analysis under *Davis*,

but do support the conclusion that relying on *Knotts* was objectively reasonable.

*See, e.g.*, *Katzin*, 732 F.3d at 209 (noting that at the time the GPS device in question

was placed, there was a circuit split on the issue of whether the warrantless use of

such devices violated the Fourth Amendment).

At bottom, sufficient Supreme Court precedent existed at the time the GPS

device was placed for the officers here to reasonably conclude a warrant was not

necessary in these circumstances. Plainly, post-*Jones*, the landscape has changed,

and law enforcement will need to change its approach accordingly.

IV. **Appellants' remaining arguments.**

A. **The denial of a *Franks* hearing**.

As part of its investigation into Aguiar's activities, the government sought

a pen register and trap and trace warrant. In his April 3, 2009 application for a

hybrid pen register/trap and trace order, DEA Agent Couture affirmed that on

January 1, 2009, a confidential informant placed a recorded phone call to Aguiar at

21

(617) 549-2915. However, in his supporting affidavit for the June 3, 2009 hybrid order, Couture stated that the January 1 phone call was placed to Aguiar at (617) 763-8409. There is no dispute that the 8409 number in the June 3 application is the one actually called by the confidential informant. Appellants moved to suppress the evidence gathered pursuant to the trap and trace warrant, arguing that (1) the application contained a false statement of fact, and that false statement was the only evidence supporting the warrant, or (2) at a minimum, pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), an evidentiary hearing was required to determine if Agent Couture intentionally, knowingly or with reckless disregard for the truth made false statements essential to a finding of probable cause. The district court denied both requests, and appellants challenge that denial on appeal.

The district court properly denied both requests. We agree with the district court's analysis that even if the false statement were stricken from the affidavits, the affidavits are replete with information regarding controlled purchases of cocaine, in-person surveillance of Aguiar's travels and the use of multiple "burn" cell phones to conduct business among the target subjects—all of which would satisfy the necessary grounds to issue a hybrid order.

22

**B.      The search of Aguiar's cell phone.**

After Aguiar was arrested, his car was searched.  One of the items seized was his iPhone.  Roughly two months after he was arrested, the DEA examined the iPhone, and discovered a photograph of what appeared to be a brick of cocaine.  The district court found Aguiar's iPhone was located in his car, and thus the DEA could legally search it without a warrant because it was a closed container, found in the car, "that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).  On appeal, Aguiar challenges the search of his cell phone, which he argues required the agents first obtain a warrant.  *See United States v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012) (noting that cell phones are "quite likely to contain, or provide ready access to, a vast body of personal data. The potential invasion of privacy in a search of a cell phone is greater than in a search of a 'container' in a conventional sense even when the conventional container is a purse that contains an address book (itself a container) and photos.")   Even assuming arguendo that the warrantless search of Aguiar's cell phone violated the Fourth Amendment, the only evidence derived therefrom and introduced at trial was a picture of a brick of cocaine and a print-out of Aguiar's contact list.   "[E]ven an erroneous evidentiary ruling will not lead to

23

reversal unless affirmance would be inconsistent with substantial justice. . . . We will not conclude that a substantial right was affected unless it is likely that in some material respect the factfinder's judgment was swayed by the error." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997) (internal quotation marks omitted). Given the volume of evidence introduced at trial by the government, any error resulting from the introduction of evidence collected from Aguiar's cell phone was harmless. *See, e.g., United States v. Al–Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) ("A district court's erroneous admission of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury."(internal quotation marks omitted)).

**C.      The wiretap warrant application.**

The parties agree that the electronic case filing copy of the July 2, 2009 wiretap application did not contain the full and complete authorization memorandum from the Department of Justice ("DOJ").  In the proceedings below, Aguiar sought an evidentiary hearing to determine whether the application was ever complete, arguing that if the court was not presented with a copy of the entire Title III authorization memo then the July 2, 2009 wiretap was void, and any communications obtained under its authority had to be suppressed.  In

24

response, the government submitted an affidavit affirming that the memorandum submitted to the district court was complete, and any missing pages were the result of a scanning error by the clerk's office. The government attached to the affidavit a copy of the complete memorandum it claimed was filed with the court, which the district court found sufficient proof. Appellants challenge that ruling on appeal. The government argues the district court was entitled to rely on affidavit evidence to prove a complete memorandum was submitted by the DOJ. We agree. The affidavit submitted to the district court attached a complete copy of the filing that the government received from the clerk's office, and it is unclear what else the government could do to prove its contention that it submitted a complete application to the court. We find no error in the district court's refusal to conduct a hearing.

D. **Whitcomb's motion for a judgment of acquittal, or, in the alternative, for a new trial, based on the insufficiency of the evidence against him.**

It is well-established that a defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation omitted). "On such a challenge, we view the evidence in the light most favorable to the government, drawing all inferences in the

25

government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* (internal quotation marks omitted). We must uphold the jury's verdict as long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

On a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Writers & Research*, 113 F.3d 8, 11 n.3 (2d Cir. 1997)(citation omitted). The evidence must be considered "in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

On a Federal Rule of Criminal Procedure 33 motion for a new trial, the court may grant the motion "if the interest of justice so requires." In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The ultimate test . . . is whether letting a guilty

verdict stand would be a manifest injustice." *Id.* To grant the motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted).

Whitcomb argues that the evidence at trial establishes merely the existence of a buyer-seller relationship, nothing more. In *United States v. Parker*, 554 F.3d 230, 238 (2d Cir. 2009), we held that a buyer-seller relationship, "[w]ithout more," is insufficient to establish a conspiracy, because while a drug sale is a substantive crime, it lacks a separate criminal object, necessary for the showing of a conspiracy. Significantly, the fact that a buyer-seller relationship exists between co-conspirators does not insulate a buyer from a conspiracy charge "if the facts support such a charge." *Id.* at 232. In other words, the exception "does not protect either the seller or buyer from a charge [that] they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer." *Id.* at 235. Indicia of such a relationship include repeat transactions and an indication of trust such as by selling drugs on credit. *Id.* at 237.

Whitcomb does not challenge the existence of a conspiracy, but rather argues that there is insufficient evidence to support a finding that he was a

member of the conspiracy. Appellant failed to satisfy his burden. The evidence adduced at trial demonstrated that Whitcomb repeatedly purchased cocaine from Aguiar. Recorded conversations showed that Aguiar and Whitcomb were intimates, and included evidence that Aguiar complained to Whitcomb about problems Aguiar had collecting money from other distributors, with Whitcomb advising him to temporarily withhold cocaine from these other conspirators in order to give them incentive to pay their debts. We agree that much of the evidence could be read to have an innocent meaning, but when the evidence raises two permissible inferences then we must resolve such conflicts in favor of the prosecution. *Jackson*, 443 U.S. at 319. There was no error.

## CONCLUSION

We have examined the remainder of appellants' arguments and find them to be without merit. For the reasons given above, the judgments of the district court are affirmed.