17-839-cr
*United States v. Philip Zodhiates*

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2017

No. 17-839-cr

UNITED STATES OF AMERICA
*Appellee*,

*v.*

PHILIP ZODHIATES,
*Defendant-Appellant*.

————

Appeal from the United States District Court
for the Western District of New York.
No. 1:14-cr-00175-2 (RJA), Richard J. Arcara, *District Judge*.

————

Argued: April 9, 2018
Decided: August 21, 2018

————

Before: PARKER, RAGGI, *Circuit Judges*, AND FURMAN, *District Judge*.*

————

Defendant-Appellant Philip Zodhiates appeals from a judgment of conviction for conspiring with parent Lisa Miller to remove her child from the United States to Nicaragua in order to

* Judge Jesse M. Furman, of the United States District Court for the Southern District of New York, sitting by designation.

obstruct the lawful exercise of parental rights by Miller's civil union partner, Janet Jenkins, in violation of the International Parental Kidnapping Crime Act. *See* 18 U.S.C. §§ 371, 1204, and 2. AFFIRMED.

_____

PAUL J. VAN DE GRAAF, Special Assistant United States Attorney (Michael DiGiacomo, Assistant United States Attorney, *on the brief*), *for* James P. Kennedy, United States Attorney for the Western District of New York, Buffalo, New York, *for Appellee United States of America*.

ROBERT B. HEMLEY (David A. Boyd, Esq., Gravel & Shea PC, Burlington, Vermont; James W. Grable, Jr., Connors, LLP, Buffalo, New York, *on the brief*), Gravel & Shea PC, Burlington, Vermont, *for Defendant-Appellant Philip Zodhiates*.

WILLIAM J. OLSON, William J. Olson PC, Vienna, Virginia, *for Amici Curiae in Support of Appellant: Downsize DC Foundation, DownsizeDC.org, Gun Owners of America, Inc., and Gun Owners Foundation*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Defendant-Appellant Philip Zodhiates appeals from a judgment of conviction in the United States District Court for the Western District of New York (Arcara, *J.*). He was convicted of conspiring with and aiding and abetting parent Lisa Miller to remove her seven-year-old child from the United States to Nicaragua in order to obstruct the lawful exercise of parental rights by Miller's civil union partner, Janet Jenkins, in violation of the International Parental Kidnapping Crime Act ("IPKCA"). *See* 18 U.S.C. §§ 371, 1204, and 2.

Zodhiates contends that the District Court erred in declining to suppress inculpatory location information garnered from his cell phone records. The records should have been suppressed, he argues, because, in violation of the Fourth Amendment, the government had obtained them through a subpoena issued pursuant to the Stored Communications Act ("SCA"), *see id.* § 2703(c)(2), rather than a court-approved warrant. He also contends that portions of the District Court's charge to the jury and statements by the prosecutor in his summation had the effect of denying him a fair trial. We conclude that these contentions are without merit and, accordingly, we affirm the judgment.

# BACKGROUND

The facts construed in the light most favorable to the government are as follows. Lisa Miller and Janet Jenkins entered into a civil union in Vermont in 2000. In 2002, Miller gave birth to a daughter, "IMJ." About a year later, Miller and Jenkins separated, and Miller took IMJ to Virginia while Jenkins remained in Vermont. In 2003, Miller petitioned a Vermont family court to dissolve the civil union and the court awarded custody to Miller and visitation rights to Jenkins. After Miller repeatedly refused to respect Jenkins' visitation rights, Jenkins sought to enforce them in Virginia and, ultimately, the Virginia Court of Appeals held that Vermont, not Virginia, had jurisdiction over the dispute and ordered its courts to "grant full faith and credit to the custody and visitation orders of the Vermont court." *Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 332 (Va. Ct. App. 2006).

In 2007, the Vermont court warned Miller that "[c]ontinued interference with the relationship between IMJ and [Jenkins] could lead to a change of circumstances and outweigh the disruption that would occur if a change of custody were ordered." A. 189. Miller refused to comply with the order and, following several contempt citations of Miller, Jenkins returned to court in

4

Vermont. In November 2009, the Vermont family court awarded sole custody of IMJ to Jenkins and visitation rights to Miller.

In September 2009, while the Vermont litigation was pending, Philip Zodhiates, a businessman with strong ties to the Mennonite community, along with Kenneth Miller, a Mennonite pastor living in Virginia, and Timothy Miller, a Mennonite pastor living in Nicaragua, helped Miller to kidnap IMJ and flee to Nicaragua.[1] As confirmed by Zodhiates' cell phone and email records, which were introduced at trial, Zodhiates drove Miller and IMJ from Virginia to Buffalo, and then Miller and IMJ crossed into Ontario. From Ontario, Miller and IMJ traveled to Nicaragua where Miller remains a fugitive and IMJ resides. Email records also show that, following the kidnapping, Zodhiates helped Miller and her daughter settle in Nicaragua. Zodhiates coordinated with others to remove a number of personal items from Miller's Virginia apartment, and, in November 2009, Zodhiates arranged for an acquaintance who was traveling to Nicaragua to bring various personal possessions to Miller. At the time of the kidnapping, Virginia law made same-sex marriages entered into outside of Virginia void

---

[1] Lisa Miller, Timothy Miller, and Kenneth Miller are not related to each other.

there in all respects and such marriages could not be used to establish familial or step-parent rights in Virginia. *See* Va. Const. Art. I, § 15-A.[2]

The Government's investigation commenced in 2010 in Vermont, soon after it became apparent that Miller had disappeared. During the course of the investigation, the Government issued subpoenas, which are subjects of this appeal, to nTelos Wireless, a Virginia cell phone company. The subpoenas sought billing records spanning 28 months and other information[3] pertaining to two cell phones that had frequent contact with Kenneth Miller in September 2009. These

---

[2]

This provision was held unconstitutional by *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014).

[3]

Specifically:
- "All subscriber information," such as "account number," "subscriber name," and "other identifying information";
- "Means and source of payments";
- "Length of service";
- "Detail records of phone calls made and received (including local and incoming call records if a cellular account) and name of long distance carrier if not [nTelos]";
- "Numeric (non-content) detail records of text messages (including SMS), multimedia messages (including MMS), and other data transmissions made and received (including any IP address assigned for each session or connection)." A. 34.

phones were listed in the customer name "Response Unlimited, Inc.," a direct mail marketing company owned by Zodhiates. The subpoenas did not request the contents of phone calls or text messages, nor did they specifically request information concerning the locations from which phone calls were made or received.

In response to the subpoenas, nTelos produced billing records that showed detailed call information, including the date and time of phone calls made from various cell phones, together with the "service location" from which each call was made or received. Information presented in the "service location" field showed the general vicinity of the cell phone when the call was made or received, such as a county name, but did not contain details about precisely where in the general area the phone was located. These records, which were later featured prominently at Zodhiates' trial, linked Zodhiates to Miller in Virginia and Buffalo, and established telephone contact among the conspirators.

The matter was subsequently transferred to the Western District of New York, where Zodhiates, Miller, and Timothy Miller were indicted for violating the IPKCA.[4]

---

[4] Miller remains a fugitive. Timothy Miller pleaded guilty after being

7

Before trial, Zodhiates moved to suppress the cell phone evidence, arguing that because he had a reasonable expectation of privacy in his movements from one place to another, the Government violated the Fourth Amendment when it obtained the billing records with a subpoena instead of a warrant. The District Court, relying on *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979), denied Zodhiates' motion. The District Court found it "too much" to conclude that a cell phone subscriber operates under the belief that his location is kept secret from telecommunication carriers and other third parties and that because "there is no reasonable expectation of privacy in the cell phone location information at issue in this case" a warrant was not required. A. 52. (internal quotation marks omitted). At trial, the Government introduced evidence including phone records reflecting contact between Zodhiates and Miller in the months before the kidnapping; phone records reflecting contact between Zodhiates and Miller's father; Zodhiates' cell phone bill showing that he traveled from Virginia to Buffalo on the day of the kidnapping; and phone records reflecting contact between the co-conspirators.

Near the end of the trial, the District Court shared with the parties its

deported from Nicaragua to the United States.

proposed jury charge—to which no objection was lodged—which read, in part, as follows:

> In this case, the term "parental rights" means Janet Jenkins' right to visit IMJ, as that right was defined by the law and courts of Vermont at the time IMJ was removed from the United States. . . . To find that Zodhiates acted with the intent to obstruct the lawful exercise of parental rights, you must find that he acted deliberately with the purpose of interfering with Janet Jenkins' parental rights. You may consider all of the evidence of Zodhiates' other acts in determining whether the government has proven beyond a reasonable doubt that Zodhiates acted with this intent.

*United States v. Zodhiates*, No. 14-CR-175-RJA, 2016 U.S. Dist. LEXIS 125002, at *9-10 (Sept. 14, 2016).

Relying on the intended charge, the prosecutor stated in his rebuttal summation that "[i]t doesn't matter what [Zodhiates] understands about Virginia litigation," A. 267, and that the Virginia litigation "should have no bearing on the intent issues," *id.* at 262. That evening, following closing arguments, the defense concluded that this remark by the prosecutor had been improper and requested that the District Court include in its charge a "curative instruction regarding the relevance of Virginia law," reading in part that:

> Parental rights for purposes of this case are defined by reference to the law of the state where the child, [IMJ], lived before leaving the United States. Prior to this case, there were a series of court

proceedings in Vermont and Virginia about the parental rights of Lisa Miller and Janet Jenkins. One legal issue in the proceedings was whether Vermont or Virginia law governed the parental rights of Lisa Miller and Janet Jenkins. In its summation, the Government suggested that Virginia law is irrelevant to this case. That is incorrect.

If, as Lisa Miller requested, Virginia had found that Janet Jenkins had no parental rights, it would have been impossible for Lisa Miller to obstruct parental rights for purposes of the international parental kidnapping statute because Janet Jenkins would have had no parental rights that could be obstructed. I will instruct you shortly that as a matter of law, Vermont law was found to control. I will also instruct you about what parental rights Janet Jenkins had and when.

By instructing you as to the law, I am not instructing you on what the defendant knew or intended with regard to parental rights. That is a question of fact which you must decide, and which the government must prove beyond a reasonable doubt. In doing so, you may consider evidence about the litigation in both Vermont and Virginia for the purpose of considering whether the prosecution has proven beyond a reasonable doubt that Mr. Zodhiates knew Janet Jenkins had parental rights, understood those rights, and intended to obstruct those rights.

*Id.* at 74.

The District Court denied the request. It concluded that "[n]othing in the Court's current charge precludes the jury from considering both the Virginia and the Vermont litigation when it decides whether the defendant knew about and intended to obstruct Vermont rights." *Id.* at 289. It also concluded that "the

10

Court's intended charge gives the jury a properly balanced instruction on what evidence it may consider with regard to the issue of intent" and that "[t]he Court also believes that expressly instructing the jury that it may consider a Virginia litigation . . . runs the risk of unnecessarily confusing the jury." *Id.* at 288-89. At the conclusion of the trial, the District Court instructed the jury consistent with the proposed instruction it had shared with the parties earlier. Zodhiates subsequently raised this challenge to the District Court's instruction in a motion under Fed. R. Civ. P. 33 for a new trial, which the Court denied.

The jury found Zodhiates guilty on both counts of the indictment and the District Court sentenced him principally to 36 months of incarceration. This appeal followed. Zodhiates' main contentions are that the District Court erred in refusing to suppress the cell phone records and denying his requested curative charge. We disagree and therefore we affirm.

## DISCUSSION

### I. Fourth Amendment Challenge

Zodhiates contends that the government violated the Fourth Amendment when it secured his cell phone records by subpoena under the SCA because it was required to proceed by a warrant supported by probable cause and,

consequently, the records were inadmissible. When considering an appeal stemming from a motion to suppress evidence, we review legal conclusions *de novo* and findings of fact for clear error. *United States v. Ganias*, 824 F.3d 199, 208 (2d Cir. 2016) (*en banc*).

During the pendency of this appeal, the Supreme Court decided *Carpenter v. United States*, 138 S. Ct. 2206 (2018), in which it held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell service location information]" and, therefore, under the requirements of the Fourth Amendment, enforcement officers must generally obtain a warrant before obtaining such information. *Id*. at 2217. However, Zodhiates is not entitled to have the records suppressed because, under the "good faith" exception, when the Government "act[s] with an objectively reasonable good-faith belief that their conduct is lawful," the exclusionary rule does not apply. *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotation marks omitted). This exception covers searches conducted in objectively reasonable reliance on appellate precedent existing at the time of the search. *See United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013).

In 2011, appellate precedent—the third party doctrine—permitted the government to obtain the phone bill records by subpoena as opposed to by warrant. Under this doctrine, the Fourth Amendment "does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to Government authorities." *Miller*, 425 U.S. at 443. In *Miller*, the Supreme Court held that the government was entitled to obtain a defendant's bank records with a subpoena, rather than a warrant, because the bank records were "business records of the banks" and the defendant had "no legitimate expectation of privacy" in the contents of his checks because those documents "contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 440-42 (internal quotation marks omitted). Similarly, in *Smith*, the Supreme Court held that a defendant did not have a reasonable expectation of privacy in the telephone numbers that he dialed because "[t]elephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." 442 U.S. at 743.

These cases stand for the proposition that, in 2011, prior to *Carpenter*, a warrant was not required for the cell records. We acknowledged as much in *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017), when we considered ourselves bound by the third party doctrine in *Smith* "unless it is overruled by the Supreme Court," *id*. at 97.[5]

To escape this result, Zodhiates directs us to *United States v. Jones*, 565 U.S. 400, 404 (2012), which held that when the government engages in prolonged location tracking, it conducts a search under the Fourth Amendment requiring a warrant. However, *Jones* is of no help to him. It was decided in 2012, after the Government's 2011 subpoena and consequently is not relevant to our good faith analysis. For these reasons, we conclude that the District Court properly denied Zodhiates' motion to suppress the cell location evidence.

---

[5] Further, all five courts of appeal to have considered, before *Carpenter*, whether the warrant requirement in the Fourth Amendment applied to historical cell site information concluded, in light of *Smith* and *Miller*, that it did not. *United States v. Thompson*, 866 F.3d 1149 (10th Cir. 2017); *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (*en banc*); *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), *rev'd*, 138 S. Ct. 2206 (2018); *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (*en banc*); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013).

## II. Jury Charge

Next, Zodhiates contends that the District Court erred in failing to instruct the jury, as he requested, that in considering whether he intended to obstruct parental rights under the IPKCA, those rights were defined by Virginia, rather than Vermont, law, because Virginia was the state where IMJ lived before leaving the United States. The principles applicable to this contention are familiar ones. "A defendant is entitled to have his theory of the case fairly submitted to the jury, as long as it has some foundation in the evidence," *United States v. Vaughn*, 430 F.3d 518, 522 (2d Cir. 2005), but he is not entitled to have the exact language he proposes read to the jury, *see United States v. Dyman*, 739 F.2d 762, 771 (2d Cir. 1984).

We review a district court's rejection of a requested jury charge for abuse of discretion. *See United States v. Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995). "In order to succeed on his challenges to the jury instructions, appellant has the burden of showing that his requested charge accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir. 1986). The trial

court has substantial discretion to fashion jury instructions, so long as they are fair to both sides. *See United States v. Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996).

Zodhiates' challenge fails because, as the District Court correctly noted, "[i]t is clear in this case that, as a matter of state family law, Vermont family law . . . defined parental rights, regardless of where [the child] resided." A. 291. Moreover, Zodhiates cannot show that he was prejudiced by the instruction ultimately given by the District Court.

The IPKCA defines "parental rights" as "the right to physical custody of the child . . . whether arising by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2)(B). Here, a Vermont court order afforded Jenkins parental rights. *See Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 956 (Vt. 2006). Moreover, at the time IMJ was taken from Virginia, an order from a court of that state had also recognized that the Vermont courts had jurisdiction over the custody dispute and required Virginia courts to give full faith and credit to the Vermont orders. *See Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 337-38 (Va. Ct. App. 2006); *Miller-Jenkins v. Miller-Jenkins*, 661 S.E.2d 822, 827 (Va. 2008) (recognizing Vermont's jurisdiction in reliance on law-of-the-case doctrine). Because Virginia itself recognized that the Vermont court order was controlling,

the District Court was correct when it instructed the jury that Vermont law defined parental rights. We agree with the District Court that to instruct otherwise would have been misleading and confusing.

Zodhiates attempts to sidestep the Vermont order by contending that, contrary to the District Court's conclusion, this Court in *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997), defined parental rights under the IPKCA by reference to Article 3 of the Hague Convention, which specifies "the law of the State in which the child was habitually resident immediately before the removal or retention," Hague Convention on the Civil Aspects of Int'l Child Abduction, art. 3, Oct. 25, 1980, P.I.A.S. No. 11,670. *Amer*, Zodhiates contends, means that only Virginia law defined Jenkins' parental rights.

In *Amer*, the defendant was a citizen of both Egypt and the United States. As Amer's marriage began deteriorating, he brought his three children from New York to Egypt, and he was convicted of violating the IPKCA. *Amer*, 110 F.3d at 876. In that case, in the absence of a court order or legally binding agreement, we looked to Article 3 of the Hague Convention (and, by extension, to the law of New York as the children's habitual residence prior to removal) to define parental rights. Nothing in *Amer* can reasonably be read to hold that parental

rights under the IPKCA are always defined by the state of the child's habitual residence.

In any event, Zodhiates cannot demonstrate prejudice. As the District Court noted, its charge did not prevent the parties from arguing, or the jury from deciding, what impact, if any, the Virginia or Vermont custody litigation may have had on Zodhiates' intent.[6] Indeed, the defense took considerable advantage of this latitude by making repeated references in his arguments to the Virginia litigation and to events in Virginia. *See, e.g.*, A. 123 (Def. Ex. 25, an email sent to Zodhiates about the Virginia litigation); *see also id.* at 221-26 (transcript of defense counsel discussing the Virginia litigation on cross-examination). Accordingly, we see no error.

### III. Prosecution Summation

Finally, Zodhiates contends that the District Court erred in denying his request for a curative instruction in response to the prosecutor's rebuttal summation. During that summation, the prosecutor told the jury that "[i]t

---

[6] "Nothing in the Court's current charge precludes the jury from considering both the Virginia and Vermont litigation when it decides whether the defendant knew about and intended to obstruct Vermont rights." A. 289.

doesn't matter what [Zodhiates] understands about Virginia litigation," *id.* at 267, and that the Virginia litigation "should have no bearing on the intent issues," *id.* at 262. Following closing arguments, Zodhiates objected to the remarks and requested the following curative instruction: "In its summation, the Government suggested that Virginia law is irrelevant to this case. That is incorrect." A. 74.

The District Court correctly denied the request because the prosecutor's statements, in context, were unobjectionable. The District Court recognized them for what they were: factual interpretations of the evidence and not statements of legal principles. As the District Court observed in denying Zodhiates' motion for a new trial: "[T]he AUSA's comment simply told the jury that, in the Government's view, Zodhiates's interpretation of the evidence was wrong—not that Zodhiates's understanding of the Virginia litigation was legally irrelevant." *United States v. Zodhiates*, 235 F. Supp. 3d 439, 457 (W.D.N.Y. 2017). The prosecutor was entitled to present to the jury the Government's interpretation of the evidence. He was entitled to argue that the Virginia litigation deserved no weight in the jury's consideration of Zodhiates' intent, just as the defense was entitled to, and in fact did, argue that it deserved great weight. *See United States v.*

*Salameh*, 152 F.3d 88, 138 (2d Cir. 1998) (*per curiam*) (affording prosecutor "broad latitude" as to reasonable inferences he may argue to jury).

In any event, the District Court adequately addressed Zodhiates' concerns when it instructed the jury to determine "what the defendant knew or intended with regard to" Jenkins' parental rights under Vermont law. *Zodhiates*, 235 F. Supp. 3d at 457 n.10 (internal quotation marks omitted). As the District Court correctly observed, nothing in the charge or the summation precluded the jury from considering both the Virginia and Vermont litigation when it decided whether Zodhiates knew about and intended to obstruct Jenkins' rights. For these reasons, we see no error in the prosecutor's remarks or in the District Court's response to them.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is AFFIRMED.